# United States Court of Appeals
## For the First Circuit

---

No. 02-1352

STEVEN JAMES,

Petitioner, Appellant,

v.

JOHN MARSHALL,

Respondent, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

---

Before

Lynch, Circuit Judge,
Bownes, Senior Circuit Judge,
and Lipez, Circuit Judge.

---

Robert L. Sheketoff, for appellant.
Thomas F. Reilly, Attorney General, with whom Jame J. Arguin,
Assistant Attorney General, for appellee.

---

March 14, 2003

---

**LIPEZ**, **Circuit Judge**.  After a Massachusetts Superior Court jury convicted Steven James of first degree murder and related assault charges for the 1994 death of Edward Sullivan, he was sentenced to mandatory life imprisonment.  The Massachusetts Supreme Judicial Court (SJC) affirmed the convictions.  James then petitioned the federal district court for habeas corpus relief under 28 U.S.C. § 2254, challenging the admissibility of his videotaped confession.  The district court denied James's petition. We affirm.

## I.

In its opinion on James's direct appeal, the SJC summarized the important facts.  Commonwealth v. James, 693 N.E.2d 148, 150 (Mass. 1998).  James and some friends were in a parking lot of a sandwich shop in Rockland, Massachusetts.  Some distance away, near a van belonging to the victim, an argument began between Sullivan and Steven DiRenzo, another of James's friends.  The victim took a baseball bat out of his van and used it to fend off DiRenzo, but did not actually swing it.  DiRenzo then called to James who, with several of their other friends, ran toward the van and began taunting Sullivan.  The victim fell, dropped the bat and lay motionless on his stomach as six or seven people repeatedly hit and kicked him.  Throughout the beating, he asked them to stop and made no attempt to fight back. James picked up the bat and swung it three times at Sullivan's head, crushing his skull and lacerating

-2-

his brain.  The unconscious victim was taken to a hospital, where he died two days later as a result of head injuries.

Shortly after the fight in the parking lot, James telephoned the Rockland police, stated that he thought he might have killed someone with a baseball bat, and arranged to meet a police officer at the scene of the fight.  There, after a reading of his Miranda rights, which he confirmed that he understood, he was arrested and taken to the Rockland police station.  At the police station Sergeant Richard Craig read James his Miranda rights a second time before asking him if he was willing to talk about the fight.  James indicated that he was.  Sergeant Craig brought him to a conference room and asked him if he could videotape the interview.  James replied "sure" and said that he had "no problem" with that.  The interview then began:

> Craig: - 1994 and it's 11:22 p.m.   I'm Detective Sergeant Richard Craig. Videotaping this is PCI Peter Curry. It's an inteview with Steven James.
> James: Yeah.
> Craig: Steven, I'm going to give you some rights.  And first I'd like to inform you that this is being videotaped. You have the right to remain silent. Anything you say can and will be used against you in a court of law.  You have the right to an attorney.  If you can't afford an attorney one will be appointed for you by the Commonwealth. Do you understand these rights?
> James: Yes.
> Craig: Do you wish to make a statement at this time?
> James: Nope.

```
Craig: Okay.  Can I talk to you about what
       happened earlier tonight?
James: Yup.
```

James cooperated fully throughout the interview, was forthcoming with information and, on one occasion, paused to ask Sergeant Craig, who was taking notes, if he was speaking too quickly.  At the end of the interview, Sergeant Craig asked James to review his notes, make any changes that he wanted, and sign them if he thought they were a fair and accurate representation of the interview.  James signed each page without making any objections or modifications.

James moved to suppress admission of the videotape, arguing that the interview should have been terminated immediately following his answer of "Nope" to Sergeant Craig's question about whether he wanted to make a statement.  The trial court disagreed, finding that "Nope" did not signal the invocation of his right to remain silent: "I find that the 'no' [sic] response, as demonstrated by the video, was one of semantics and that he was distinguishing between reciting a formal statement and his willingness to answer questions put to him by Craig."  On direct appeal, the SJC agreed with this determination.

James then filed a timely habeas petition in the district court for the District of Massachusetts, asserting that the admission of his videotaped interview violated his Fourteenth Amendment right to due process.  The court denied the writ, holding

that "[n]ot only has petitioner failed to show that the state courts' factual and legal determinations were unreasonable, it is clear that these determinations were fully supported by the record." James v. Marshall, No. 99-10728-RWZ, 2002 U.S. Dist. LEXIS 8157, at *5 (D. Mass. March 12, 2002). Petitioner now appeals.

## II.

A federal court may grant habeas relief to a state prisoner if it finds, inter alia, that the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law . . ." 28 U.S.C. § 2254(d)(1) (2002). This section "defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court." Williams v. Taylor, 529 U.S. 362, 404-05 (2000). A state court decision is "contrary to" clearly established federal law if it "applies a rule that contradicts the governing law set forth in [Supreme Court] cases." Id. at 405. A state court decision involves an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle from [Supreme Court] cases but unreasonably applies it to the facts" of the petitioner's case, or if the state court either "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not

apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407. In either case, the state court's determination must be unreasonable, not simply incorrect. Id. at 411.

### III.

The SJC affirmed the trial court's conclusion that when James stated "Nope" in response to Sergeant Craig's inquiry about making a statement, he was declining to make a formal statement, rather than refusing to answer further questions. Therefore, the SJC found that "Nope" was not an unequivocal assertion of his right to remain silent which required an end to further questioning. In reaching this conclusion, the SJC said the following:

> We cannot say this determination was clearly erroneous. Immediately before and after that point, the defendant appears to have been quite willing to talk. The judge was warranted in concluding that the defendant did not suddenly change his mind about discussing the incident, but had no prepared speech.

James, 693 N.E.2d at 151 (emphasis added).

James argues that the SJC's consideration of his conduct and answers after he said "Nope" violated clearly established Supreme Court precedent in Smith v. Illinois, 469 U.S. 91 (1984). In order to evaluate that argument, we must describe the administration of the Miranda rights and the Supreme Court's holding in Smith in some detail.

-6-

Eighteen-year-old Steven Smith was arrested in connection with an armed robbery. Shortly after his arrest, Smith was taken to an interrogation room for questioning by two police detectives. The interview began as follows:

> Q: Steve, I want to talk with you in reference to the armed robbery that took place at McDonald's restaurant on the morning of the 19th. Are you familiar with this?
>
> A: Yeah. My cousin Greg was.
>
> Q: Okay. But before I do that I must advise you of your rights. Okay? You have a right to remain silent. You do not have to talk to me unless you want to do so. Do you understand that?
>
> A: Uh. She told me to get my lawyer. She said you guys would railroad me.
>
> Q: Do you understand that as I gave it to you, Steve?
>
> A: Yeah.
>
> Q: If you want to talk to me I must advise you that whatever you say can and will be used against you in court. Do you understand that?
>
> A: Yeah.
>
> Q: You have a right to consult with a lawyer and to have a lawyer present with you when you're being questioned. Do you understand that?
>
> A: <u>Uh, yeah. I'd like to do that.</u>
>
> Q: Okay.

Id. at 92-93 (emphasis in original). Instead of terminating the interview at this point, the interrogating officer proceeded to finish reading Smith his Miranda rights and then pressed him again to answer their questions.

> Q: . . . If you want a lawyer and you're unable to pay for one a lawyer will be appointed to represent you free of cost, do you understand that?

```
A:    Okay.
Q:    Do you wish to talk to me at this time
      without a lawyer being present?
A:    Yeah and no, uh, I don't know what's
      what, really.
Q:    Well, you either have to talk to me
      this time without a lawyer being
      present and if you do agree to talk
      with me without a lawyer being present
      you can stop at any time you want to.
A:    All right.  I'll talk to you then.
```

Id. (emphasis in original).  Smith went on to make a confession and

was convicted of armed robbery after the trial court denied his

motion to suppress the confession.  The Illinois Supreme Court

affirmed his conviction.  People v. Smith, 466 N.E.2d 236 (Ill.

1984).

In assessing whether Smith had invoked his right to

counsel, the U.S. Supreme Court acknowledged that "an accused's

asserted request for counsel may be ambiguous or equivocal," and

that "courts have developed conflicting standards for determining

the consequences of such ambiguities."  Id. at 95.  In this case,

however, the Supreme Court saw no need to resolve those conflicting

standards.  The Court explained:

> The conflict among courts is addressed to the
> relevance of alleged ambiguities or
> equivocations that either (1) precede an
> accused's purported requested for counsel, or
> (2) are part of the request itself.  Neither
> circumstance pertains here, however.  Neither
> the state nor the courts below, for example,
> have pointed to anything Smith previously had
> said that might have cast doubt on the meaning
> of the statement "I'd like to do that" upon
> learning that he had the right to his
> counsel's presence. . . .    Nor have they

-8-

> pointed to anything inherent in the nature of Smith's actual request for counsel that reasonably would have suggested equivocation.

Id. at 96-97.  The court then went on to explain why it had to reverse the decision of the Illinois Supreme Court:

> The courts below were able to construe Smith's request for counsel as "ambiguous" only by looking to Smith's subsequent responses to continued police questioning and by concluding that, "considered in total," Smith's "statements" were equivocal.  This line of analysis is unprecedented and untenable . . . .  Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease.  In these circumstances, an accused's subsequent statements were relevant only to the question of whether the accused waived the right he had invoked.  Invocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together.

Id. at 97-98 (internal citations omitted).

In cases addressing the issue of whether the Miranda rights of a person in police custody have been "scrupulously honored," Mosley, 423 U.S. at 104, the Smith case indicates that there is often a threshold issue:  whether the suspect actually invoked the rights in the first instance.  If the individual unambiguously invokes his rights, he "is not subject to further interrogation by the authorities . . . unless the accused himself initiates further communication, exchanges, or conversations with the police."  Edwards v. Arizona, 451 U.S. 477, 484-85 (1981).

-9-

However, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect <u>might</u> be invoking the right to counsel, our precedents do not require the cessation of questioning." <u>Davis</u> v. <u>United States</u>, 512 U.S. 452, 459 (1994). As the <u>Davis</u> decision makes clear, this threshold inquiry is an objective one. "Invocation of the <u>Miranda</u> right to counsel requires at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." <u>Id.</u> (internal citations omitted).

Both <u>Smith</u> and <u>Davis</u> addressed the question of the need for clarity in a suspect's invocation of the right to counsel, rather than the right to remain silent implicated in this case. However, every circuit that has directly addressed the issue "has concluded that <u>Davis</u> applies to both components of Miranda: the right to counsel and the right to remain silent." <u>Bui</u> v. <u>DiPaolo</u>, 170 F.3d 232, 239 (1st Cir. 1999) (collecting cases). This circuit, joining the Ninth and the Second Circuits, has heretofore left the issue open. <u>Id.</u> at 239 ("[W]e acknowledge that <u>Davis</u> does not 'authoritatively' answer the question in the narrow, technical sense of that term."). Given the habeas context in which James raises the challenge to the treatment of his right to remain silent by the police and the state courts, we leave open again the issue of the applicability of <u>Davis</u> to both the right to counsel and the

right to remain silent. "For the purposes of habeas corpus review, we simply cannot deem unreasonable a conclusion by the Massachusetts courts [to apply right to counsel principles to a right to remain silent case] that is consistent with the approach taken by so many respected tribunals." Id. Thus, in this habeas context, we view the Smith and Davis precedents as clearly established federal law applicable to our evaluation of the SJC's decision on James's invocation of his right to remain silent.

However, in asserting that the SJC ruled contrary to Smith, James ignores the holding in Smith, which was premised on the unambiguous assertion of the right to remain silent: "We hold only that, under the clear logical force of settled precedent, an accused's postrequest responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." Smith, 469 U.S. at 100 (second emphasis added). In this case, the trial court found ambiguity in James's response of "Nope" to the question, "Do you wish to make a statement at this time?" In evaluating that finding of ambiguity by the trial court, the SJC did look at the circumstances of James's interview before and after he said "Nope."

> We cannot say this determination was clearly erroneous. Immediately before and after that point, the defendant appears to have been quite willing to talk. The judge was warranted in concluding that the defendant did not suddenly change his mind about discussing the incident, but had no prepared speech.

-11-

_James_, 693 N.E.2d at 151.  However, because the SJC did not refer to James's post-"Nope" responses "to cast retrospective doubt on the clarity of the initial request itself," _Smith_, 469 U.S. at 100, the SJC's decision was not contrary to the clearly established _Smith_ precedent.  Instead, the SJC used these responses, in part, as Sergeant Craig used them during the interrogation of James himself -- to determine whether James was in fact invoking his right to remain silent with his ambiguous answer.

After James says "Nope" to the inquiry about a formal statement, Sergeant Craig does not ignore his answer and forge ahead with questions about the deadly event.  Instead, he asks him a question designed to clarify the meaning of his answer:  "Okay.  Can I talk to you about what happened earlier tonight?"  James answers "Yup."  Only then does the questioning about the events continue.  This is precisely the kind of "good police practice" described by the Supreme Court in _Davis_, where the Supreme Court declined to adopt a rule requiring officers to ask clarifying questions in the face of an ambiguous assertion of the right to counsel, but noted that "when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney."  _Davis_, 512 U.S. at 461.  That was essentially what Sergeant Craig did here with respect to James's invocation of the right to remain silent.

Hence, the "unreasonable application of federal law" issue under AEDPA turns on the threshold question posed by Davis: whether a reasonable police officer in the position of Sergeant Craig would have treated James's invocation of the right to remain silent as ambiguous, thereby justifying the clarifying question that Sergeant Craig asked James.  Davis, 512 U.S. at 459.  The trial court was correct to answer that question affirmatively, and so was the SJC.  Therefore, in summary, the decision of the SJC was neither contrary to Smith, nor an unreasonable application of Davis.

**Affirmed**.