**David W. ROSADO, Petitioner,**

v.

**Peter ALLEN, Respondent.**

**Civil Action No. 02–10359–DPW.**

United States District Court,
D. Massachusetts.

March 30, 2007.

---

David W. Rosado, MCI–Cedar Junction, South Walpole, MA, Pro se.

Emanuel Howard, Brookline, MA, for Petitioner.

Cathryn A. Neaves, Dean A. Mazzone, Attorney General's Office, David M. Lieber, Assistant Attorney General, Boston, MA, for Respondent.

Peter Allen, MCI–Cedar Junction, South Walpole, MA, Pro se.

## MEMORANDUM AND ORDER

WOODLOCK, District Judge.

Petitioner David W. Rosado seeks habeas corpus relief from his Massachusetts state court conviction for first degree murder. He is serving a life sentence without the possibility of parole. His principal complaint is that his trial counsel did not engage a psychological expert to explore a lack of mental capacity defense.

The record in this case came to me in an awkward posture. The state trial judge, limited by the then-applicable restrictions on the availability of state resources to support post-conviction evidentiary development for indigent defendants, denied relief from the judgment of conviction after carefully considering the constrained record before him. Thereafter, the Supreme Judicial Court, apparently misconstruing the record, affirmed.

Due to the absence of a completely developed record, I invoked the resources of the federal courts to support adequate legal assistance to petitioner before resolving the petition in full. Having granted Petitioner's motion for certain funds for expert services so that he could more fully develop the basis for his claim of lack of mental capacity and having held a full evidentiary hearing, I conclude, for the reasons stated below,[1] that he is not entitled to relief on any of his claims. Accordingly, I will direct the Clerk to dismiss the petition.

## I. BACKGROUND

### A. *Factual Background*

The facts underlying Rosado's conviction are set forth in *Commonwealth v. Rosado,*

---

1. As will appear from the text of this Memorandum, I have written prior unpublished Memoranda covering much of the background and underlying law in this case. The instant Memorandum finally disposing of the case is intended for publication in F.Supp.2d. Consequently, in order to make it comprehensive and self-sufficient in its own right and avoid cross reference to decisions not found in F.Supp.2d, I have imported verbatim portions from those prior Memoranda.

434 Mass. 197, 198–99, 747 N.E.2d 156 (2001), *cert. denied,* 534 U.S. 963, 122 S.Ct. 372, 151 L.Ed.2d 283 (2001), and are presumed to be correct under 28 U.S.C. § 2254(e)(1), *see Gunter v. Maloney,* 291 F.3d 74, 76 (1st Cir.2002). A summary will suffice here.

On the night of January 14, 1995, Rosado and Kevin Babbitt,[2] both vocal proponents of white supremacy, inflicted a brutal beating on Mr. Greene, an African-American who had earlier asked them to turn down the volume of the music in their Attleboro motel room. After kicking and punching the victim in his neighboring motel room, Rosado and Babbitt continued to beat the victim in the cement parking lot outside the motel before returning him to his motel room, where he languished for several days.

A few days after the beating, Babbitt, Rosado, and Steven Richard went to the victim's room and found him lying on his bed, naked, unable to move, and foaming at the mouth. Instead of calling for medical help, Rosado and Richard[3] stood by as Babbitt suffocated the victim. The trio then carried the victim's body and buried it in a shallow grave behind the motel. In March 1995, after the body was recovered by police, a medical examiner determined the cause of death to be blunt trauma to the head.

## B. *Procedural History*

At trial, Rosado acknowledged his participation in the initial beating but asserted that Babbitt's suffocation of the victim was an independent intervening event that relieved him of criminal liability for the murder. *Rosado,* 434 Mass. at 199, 747 N.E.2d 156. The jury apparently rejected this theory and returned a guilty verdict of first degree murder by extreme cruelty or atrocity. Rosado filed a notice of appeal the next day.

Rosado then filed a motion for a new trial under Mass. R. Civ. P. 30 on grounds of ineffective assistance of counsel and errors in jury instructions. He also filed a motion for funds so he could prosecute his motion for a new trial. Judge Hely, who had presided over the trial, issued a memorandum and order denying both motions. Judge Hely concluded that Rosado's trial counsel, Gerald FitzGerald, demonstrated a high level of competence in defending Rosado.

Rosado appealed the denial to the Supreme Judicial Court and asked the SJC to consolidate the direct appeal of his conviction with the appeals of his denied motions. The SJC affirmed both Rosado's conviction for murder and the order denying his post-trial motions. *Rosado,* 434 Mass. at 198, 747 N.E.2d 156. Rosado thereafter filed this habeas petition under 28 U.S.C. § 2254.

Rosado's petition, as initially framed, contained several unexhausted claims. In a Memorandum and Order, I ruled that I would allow Respondent's motion to dismiss the petition unless Rosado promptly amended his pleading to proceed upon only those claims in the petition that were exhausted. *Rosado v. Allen,* No. 02–10359-DPW, 2003 WL 1475031 (D.Mass. Mar. 20, 2003).[4] Rosado thereupon filed a Notice of

---

**2.** In a separate proceeding, a jury convicted Babbitt of first degree murder. *Commonwealth v. Babbitt,* 430 Mass. 700, 723 N.E.2d 17 (2000).

**3.** Richard was charged as an accessory after the fact to the murder. *Babbitt,* 430 Mass. at 702 n. 2, 723 N.E.2d 17.

**4.** In the March 20, 2003 Memorandum, I found Grounds Three and Four of the petition unexhausted. These grounds concerned the

Amendment stating his intention to proceed on only the exhausted claims.

## II. THE PETITION AS NOW FRAMED

Rosado now presses and I find properly before me four exhausted grounds to support his claim for habeas corpus relief. Ground One alleges ineffective assistance of counsel on the basis that Rosado's counsel failed properly to investigate his mental state at the time of the crime, which, according to Rosado, would have bolstered a defense theory based on mental impairment. In this connection, Rosado alleges in Ground Two that he was unconstitutionally denied funds to obtain an expert to prove his ineffective assistance claim. Grounds Five and Six allege respectively that the trial judge failed to instruct the jury on mitigating circumstances that would have negated malice and that the faulty instructions, as a whole, effectively diminished the Commonwealth's burden of proof.

I consider, in the order asserted, the Grounds properly before me after outlining the general standards for federal habeas corpus.

### A. *Standard of Review*

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a federal court may not grant an application for a writ of habeas corpus unless the state court decision below was (1) "contrary to, or an unreasonable application of clearly established" federal law, as determined by the Supreme Court, or (2) "based on an unreasonable determination of the facts in light of the evidence" presented during the state court proceeding. 28 U.S.C. § 2254(d).

■ "A state court decision is 'contrary to' clearly established federal law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases.'" *James v. Marshall*, 322 F.3d 103, 106 (1st Cir.2003) (alteration in original) (quoting *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). The state court has performed an "unreasonable application" of clearly established law if that court " 'identifies the correct governing legal principle from [Supreme Court] cases but unreasonably applies it to the facts' of the petitioner's case, or if the state court either 'unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" *James*, 322 F.3d at 106 (alterations in original) (quoting *Williams*, 529 U.S. at 407, 120 S.Ct. 1495). The "mere fact that there was some error or that the state decision was incorrect is not enough" to establish an unreasonable application of law. *McCambridge v. Hall*, 303 F.3d 24, 36 (1st Cir.2002) (en banc).

■ A state court's findings of fact "shall be presumed to be correct" and the petitioner bears the burden of disproving factual findings by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *McCambridge*, 303 F.3d at 34–35; *Sanna v. Dipaolo*, 265 F.3d 1, 10 (1st Cir.2001).

### B. *Ground One: Denial of Effective Assistance of Counsel Regarding Insanity Defense*

Rosado asserts that he was denied effective assistance of counsel as guaranteed by the Constitution because his trial counsel failed to investigate an insanity defense under the doctrine of *Commonwealth v. McHoul*, 352 Mass. 544, 546–47, 226

purported failure of the trial judge to instruct the jury adequately on the issues of mental impairment and proximate cause. 2003 WL 1475031, at *2–4.

N.E.2d 556 (1967). Contending that trial counsel had information regarding Rosado's habitual intoxication, history of aggressive behavior, and heavy ingestion of alcohol the night of the incident, Rosado argues that trial counsel should have delved further into the history of his alcohol abuse, obtained a mental health examination, and "at least investigated the viability of presenting expert testimony for an insanity defense." He argues that the failure to perform "even minimal investigation of a defense built on expert testimony about criminal responsibility," effectively stripped him of "the only realistic affirmative defense available to him."

To determine whether counsel's performance was effective under the Sixth Amendment,[5] a reviewing court must ask "whether counsel has brought 'to bear such skill and knowledge as will render the trial a reliable adversarial testing process.'" *Scarpa v. DuBois*, 38 F.3d 1, 8 (1st Cir.1994) (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)), *cert. denied*, 513 U.S. 1129, 115 S.Ct. 940, 130 L.Ed.2d 885 (1995). This inquiry involves a two-part test.

First, a defendant must show that, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052. This evaluation of counsel's performance "demands a fairly tolerant approach." *Scarpa*, 38 F.3d at 8. The court must apply the performance standard "not in hindsight, but based on what the lawyer knew, or should have known, at the time his tactical choices were made and implemented." *United States v. Natanel*, 938 F.2d 302, 309 (1st Cir.1991), *cert.*

*denied*, 502 U.S. 1079, 112 S.Ct. 986, 117 L.Ed.2d 148 (1992).

Second, a defendant must establish that prejudice resulted "in consequence of counsel's blunders," which entails "a showing of a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Scarpa*, 38 F.3d at 8 (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052). Counsel's actions are to be judged "in light of the whole record, including the facts of the case, the trial transcript, the exhibits, and the applicable substantive law." *Scarpa*, 38 F.3d at 15.

Only if I find that counsel was ineffective need I then determine whether the state court's decision was an unreasonable application of *Strickland. See (Terry) Williams v. Taylor*, 529 U.S. 362, 390–98, 120 S.Ct. 1495, 146 L.Ed.2d 389 (analyzing Williams' claim according to this sequence); *id.* at 412–16, 120 S.Ct. 1495 (O'Connor, J., concurring) (analyzing Williams' claim according to this sequence); *Ouber v. Guarino*, 293 F.3d 19, 30 (1st Cir.2002) (analyzing claim according to this sequence, and explaining that "[w]ere we sitting in direct review, the foregoing analysis would lead us to find counsel's performance constitutionally unacceptable. In the exercise of habeas jurisdiction, however, we must take another step and evaluate the reasonableness of the Appeals Court's contrary conclusion."). As will appear below, in the interest of completeness, I will follow the approved sequence to conclusion, although I do not find Petitioner to have established that his trial counsel was ineffective in the first place.

---

5. "In all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for his defense." U.S. CONST. amend. VI.

Rosado's Sixth Amendment claim begins with the proposition that counsel was ineffective in failing at least to talk to a mental health or psychological expert in order to explore an insanity defense. This subdivides into three questions: (1) did counsel actually engage a psychological expert in considering whether to pursue an insanity defense, (2) if not, then given the information available to counsel during the pretrial investigatory phase, did counsel's failure to engage expertise in evaluating the insanity defense result in assistance below the level of minimally competent representation, and finally (3) was there a reasonable probability that, had counsel investigated the possibility of psychological testimony, the ultimate result of the trial would have been different.

1. *Engagement of a psychological expert*

■ There is no dispute that Rosado's trial counsel did not engage a psychological expert to support a potential insanity defense. At the hearing I conducted in this matter, FitzGerald, his trial counsel, acknowledged as much. It is worth noting, however, that the Supreme Judicial Court apparently—as the Commonwealth conceded before me—labored under the misapprehension that trial counsel *had* contacted a psychological expert.[6] The SJC's recitation of the facts suggests that trial counsel hired a psychological expert, was initially " 'unclear' as to the substance of the expert's findings," wavered in whether to present that expert's testimony, and finally "made the strategic decision not to call the expert as a witness and advanced, as his primary argument, the 'cause of death' theory." *Rosado*, 434 Mass. at 200, 747 N.E.2d 156. Unfortunately, the SJC evidently confused a *pa-*

*thology* expert (whom trial counsel hired, but eventually decided not to call) with a *psychological* expert (who did not exist, because trial counsel never engaged such an expert in support of this potential defense). A comparison of the Superior Court's description of events at trial with the SJC's illustrates the SJC's apparent error. *Compare* R. 147–50 (Superior Court opinion rejecting motion for new trial) *with* 434 Mass. at 200, 747 N.E.2d 156.

The only expert that the defense contacted was a pathologist. Trial counsel obtained funds in state district court to hire both a forensic pathologist and a private investigator. In Superior Court, Rosado successfully moved for additional funds for the pathologist and investigator. The pathologist was Dr. Edward Sussman. Rosado later moved to continue the trial to accommodate Dr. Sussman's testimony. Dr. Sussman was announced to the jury as a possible witness. Judge Hely found that trial counsel "consulted with Dr. Sussman extensively in his trial preparation and during the trial," as part of the defense theory that the victim did not die from the defendant's beating. He found that trial counsel decided not to call Dr. Sussman for tactical reasons because, by the time the defense rested, counsel "ha[d] full knowledge of what [Dr. Sussman's] testimony would be had he testified." Trial counsel told Judge Hely after the closing argument that "at the time I made my opening argument, it was unclear to me what [Dr. Sussman's] testimony would be . . . [a]nd that controlled quite a bit of what I said in my opening argument."

The SJC quoted many of these statements, but seemed to believe they referred

---

6. I do not apply § 2254(e)(1)'s presumption of correctness to the SJC's recital of this aspect of the pretrial investigation and trial itself, because I find by clear and convincing evidence—and the parties agree—that the SJC was in error in suggesting a psychological expert was consulted.

to a psychological expert. *See* 434 Mass. at 200, 747 N.E.2d 156. It apparently confused Dr. Sussman, a pathologist whom the defense hired and consulted but did not call to testify, with a psychological expert. In testimony at the hearing before me, FitzGerald testified that no psychological expert was ever hired, consulted, or contacted.

### 2. *Counsel's Performance*

I now must determine "whether, in light of all the circumstances, the identified ... omissions were outside the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. I begin with the evidence potentially available to counsel at the pretrial investigation stage.

Counsel had sufficient information on hand to know that Rosado had a lengthy criminal record, a history of aggressive behavior, and a long-standing problem with alcohol. This information alone would not necessarily prompt most attorneys to seek a psychological examination.

But there were additional aspects of Rosado's background that might have prompted a psychological examination. For example, Rosado's mother now avers that, had counsel asked, she might have told him facts that would have raised red flags: a school referral to a psychologist as a result of behavioral problems as early as second grade, Rosado's own termination of his visits with the psychologist after three or four sessions, serious academic and behavior problems throughout his education, a withdrawal from school without completing ninth grade (after several attempts), an early discharge from a Juvenile Court-referred hospital-based alcohol/drug treatment program on the grounds of noncooperation, and at least four emergency room visits—three while a juvenile—due to injuries sustained while intoxicated. Apparently counsel did not request copies of Rosado's school, medical, or detailed juvenile court or probation records.

Given what counsel *did* know and what he *could have* learned, I must now decide whether his failure to investigate an insanity defense was incompetent. This is a mixed question of law and fact. In addressing this question, I am informed by prevailing norms of competence:

> Prevailing norms of practice as reflected in American Bar Association standards and the like, e.g., ABA Standards for Criminal Justice ... are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.

*Strickland,* 466 U.S. at 688–89, 104 S.Ct. 2052.

The Supreme Court has emphasized that strategic choices receive wide deference when based on reasonable investigations:

> Strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Id.* at 690–91, 104 S.Ct. 2052.

 Counsel, however, need not investigate every strategic alternative:

> In any ineffectiveness case, a particular decision not to investigate must be di-

rectly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* "If it is reasonable in the circumstances not to conduct a particular investigation, [a] lawyer's failure to do so will not establish ineffective representation." *Jones v. Page,* 76 F.3d 831, 843 (7th Cir.1996) (internal quotation marks deleted; alteration in original), *cert. denied,* 519 U.S. 951, 117 S.Ct. 363, 136 L.Ed.2d 254 (1996). Particularly in the context of an insanity defense, which "[a]ll too often, criminal defense attorneys are willing to pursue . . . without a proper or sound basis for doing so," it is important not to "send contradictory messages to attorneys, who are ethically obligated not to waste the court's time," by "[r]equiring exhaustive and unwarranted investigation and presentation of psychiatric defenses." *Id.* Thus, the question before me is whether FitzGerald's failure to investigate an insanity defense was reasonable.

At the evidentiary hearing before me on this matter, FitzGerald explained his conduct.[7] His decision not to pursue an insanity defense was grounded in two determinations. First, he concluded that Rosado was able to conform his conduct to the law and was able to appreciate the wrongfulness of his conduct. In other words, FitzGerald concluded that Rosado was not legally insane at the time of the offense. Second, FitzGerald made a strategic decision that introducing an insanity defense would weaken his chances of success overall.

In their first meetings, FitzGerald, following his customary routine with new clients, interviewed Rosado extensively. FitzGerald asked about Rosado's past psychiatric and psychological treatment, psychological difficulties, and stays in mental health facilities. He questioned Rosado about his school and family histories. In response, Rosado disclosed that he dropped out of school in the ninth grade, and had once been a resident of an alcohol treatment center in connection with the

---

**7.** I note that when making preliminary rulings in this case, I did not have the benefit of FitzGerald's testimony. Indeed, he was apparently not even solicited by either of the parties to provide testimony. Shortly before the evidentiary hearing he wrote Petitioner's counsel, who was seeking assistance in pursuing document discovery:

> I am dumfounded to learn for the first time yesterday, by reading a motion filed by [defendant's counsel], that apparently an evidentiary hearing was held on May 5, 2004 as to the claim of my purported ineffective assistance without me (1) knowing of the hearing, (2) without having the slightest opportunity to present evidence to the contrary, (3) without ever seeing any document filed in support of the claim and (4) apparently without the Attorney General presenting any evidence to the contrary. I am at a loss to understand how this could ever occur.

In my experience, it is not unusual when new counsel for a defendant chooses to pursue an ineffective assistance of counsel challenge to a conviction for there to be no evidence adduced—apart from events reflected in the state court record—regarding the views, perspectives or recollections of the allegedly ineffective counsel. Whether as a result of lack of diligence in developing the collateral attack record or concern about what a lawyer whose professional competence is challenged in pursuit of a more favorable result for a quondam client might say, the parties frequently do not afford allegedly ineffective counsel a chance to be heard. Here, FitzGerald learned of the attack on his conduct and apparently sought to appear. His testimony made a material difference to the ultimate outcome of this proceeding. The experience of this case encourages me to make it an explicit and consistent practice independently to assure that prior counsel, such as FitzGerald, whose professional work may face a real likelihood of being the subject of adverse findings in a collateral attack proceeding, be afforded have notice and an opportunity to be heard.

disposition of a juvenile case. He mentioned no mental health issues.

FitzGerald, in live testimony I credit against the affidavits of members of Rosado's family, explained he was not able to obtain much information from Rosado's family. He found Rosado's father, stepfather, and mother to be "most disinterested." Rosado's father was a drug dealer, who involved Rosado in dealing drugs at a young age. His mother was more concerned with attending a real estate closing than the trial, and she agreed to testify briefly on her son's behalf only after FitzGerald exerted "considerable pressure." His stepfather said that he "really did not want to testify or get involved with the thing."

Concluding that Rosado's history lacked meaningful and relevant mental health issues, and given the facts of the case and Rosado's apparent ability to recall them, FitzGerald chose not to pursue an insanity defense. The record was, in FitzGerald's words, "ripe with evidence" that Rosado had the capacity to appreciate the wrongfulness of his conduct: after fighting with the victim, Rosado looked around for witnesses; he left the scene the next day and gave a false explanation for why he had fled; he buried the victim at night and took a route that was shielded from the view of neighboring houses. There was also evidence that Rosado was capable of conforming his behavior to the law. For example, Rosado had difficulties with the victim in the past and had not resorted to violence, even after drinking heavily.

Most telling, from FitzGerald's perspective, was Rosado's ability to recall the details of the murder. Rosado remembered the objects he used to strike the victim, which side of the head he struck, the location where the beating took place; he even gave "impeccable" directions to the site. He remembered the time of day, the words exchanged, the victim's paranoid demeanor. He related the events of the hours before the murder, including the number of drinks he had and his past difficulties with the victim. With the exception of some small details, Rosado's story was "absolutely consistent" from the day FitzGerald first interviewed him right through to the trial. From this evidence, FitzGerald concluded that there was no "credible possibility" of insanity that would lead him to consider asking a court for funds to consult a psychiatrist.

In addition to this judgment regarding Rosado's mental health, FitzGerald made a tactical decision not to pursue an insanity defense. From his past experience, which is considerable, he has found that certain defenses are effectively "incompatible." The primary theory of defense that FitzGerald advocated was that the victim died from asphyxiation, not from Rosado's beating. FitzGerald also offered evidence of intoxication to persuade jurors who might be more lenient towards a defendant who was drunk when he acted violently. However, FitzGerald believed that an insanity defense would so contradict the evidence that it would weaken the primary defense. Thus, he concluded that he could not "plausibly or honestly present an insanity defense."

FitzGerald is a very experienced trial lawyer. In private practice, as an assistant district attorney, and as First Assistant state attorney general, he has tried about sixty criminal cases since 1983. During the period from 1991 to 1999 surrounding Rosado's 1996 trial, FitzGerald was in private practice. While in private practice, he accepted assignments, such as this case, through the Committee for Public Counsel Services ("CPCS") list of trial counsel determined by CPCS qualified to handle murder cases. He had represented about twenty first-degree murder defendants, only four of whom were convicted.

He had used CPCS's resources regarding mental health professionals, and had mounted insanity defenses using expert witnesses.

With this more complete view of the circumstances under which FitzGerald made his decision and the experience base from which he drew, I return to the question at hand: given the evidence available and potentially available at the pretrial investigation phase, was it reasonable for FitzGerald to fail even to consult with a psychological expert?

To be sure, it would have been reasonable and, in retrospect, prudent to make a preliminary investigation and then, based on initial findings, decide (strategically) that it was unlikely to pan out. For instance, in *Jones v. Page*, the defendant's attorney consulted informally with a court psychologist who had counseled the defendant since his arrest, and the psychologist opined to him that the defendant was sane at the time of the offense. 76 F.3d at 842. Based on that opinion, as well as his own observations of the defendant's demeanor in over twenty meetings before a guilty plea was offered, counsel concluded that an insanity defense would be "meritless and inappropriate," and his failure to request a mental evaluation was found not deficient. *Id.* at 842–43.

■ By contrast, it is not within the standards of competence, in a murder case, completely to neglect consideration of an insanity defense if there are reasonable signs it might apply. The First Circuit once forcefully observed in the abstract that it is "inexcusable" for counsel not to

do so where there were hints that it might be available:

> Defendant says he had nothing to lose by having an insanity examination. Admittedly, the Commonwealth would have been required to pay for it, and the report would have been privileged and unavailable to it. If the report proved affirmative, defendant was ahead. If it proved negative, he need not use it.... Where insanity would have been a complete defense, it was inexcusable not to pursue it.... To forego even exploring a possible complete defense because offering it might weaken a partial one (reducing murder one to murder two) seems an extraordinarily unbalanced choice. Whether counsel made it deliberately (as to which there was no evidence) or by default, we cannot find it within the most tolerant standard of competence.

*Genius v. Pepe*, 50 F.3d 60, 60–61 (1st Cir.1995) (Aldrich, J.) (internal citations omitted);[8] *accord Brown v. Sternes*, 304 F.3d 677, 692 (7th Cir.2002) ("Where the record establishes that counsel had reason to know, from an objective standpoint, that a possible defense, such as insanity, was available, failure to investigate fully can constitute ineffective assistance of counsel."); *United States v. Edwards*, 488 F.2d 1154, 1164–65 (5th Cir.1974) (holding it was ineffective assistance of counsel not to investigate insanity). Yet, a lawyer certainly need not consult a psychological expert in every case in which the defendant has exhibited anti-social tendencies in the past. The more precise question is whether a history (which might have been devel-

---

**8.** I note that in *Genius*, the evidence suggesting a possible insanity defense was much stronger than it is here. Nevertheless, on remand in *Genius*, Judge Stearns — even after Judge Aldrich had observed in the initial First Circuit decision that a failure to explore an insanity defense was "inexcusable" — found, after careful consideration of an ex-

panded record, that the decision of defendant's trial counsel there not to pursue an insanity defense did not constitute ineffective assistance of counsel. *Genius v. Pepe*, 986 F.Supp. 668, 682 (D.Mass.1997), *aff'd* 147 F.3d 64 (1st Cir.1998), *cert. denied*, 526 U.S. 1121, 119 S.Ct. 1773, 143 L.Ed.2d 802 (1999).

oped more fully by an aggressive factual investigation) of alcohol and drug abuse, of violent and impulsive behavior while drunk, and of behavioral problems in school is sufficient to require an expert psychological consultation. The answer to that question is necessarily fact-bound.

 In this case, "considering all of the circumstances" and "applying a heavy measure of deference to counsel's judgments" as required by *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052, I find that consultation with a psychological expert was not required to provide effective assistance of counsel in this case. While FitzGerald has no formal training in psychology or psychiatry, he is a seasoned criminal trial lawyer who had made use of those highly contextual mental health disciplines in the conduct of litigation. He considered Rosado's apparent lack of clinical mental health history, his clear recall of the murder and surrounding events, and the numerous facts indicating that Rosado was aware of the wrongfulness of his acts. As a practical matter, he reasoned that presenting an insanity defense—when the facts militated so strongly against it—would ultimately weaken Rosado's chances of success. Given FitzGerald's experience, the evidence before him, and the fact that he made a considered, strategic decision, I cannot say that his failure to consult with an expert was outside the bounds of reasonable professional behavior.

To hold otherwise would stretch *Strickland* beyond the breaking point. *Strickland* requires judicial scrutiny of counsel's performance to be highly deferential. Although FitzGerald could have avoided the current controversy by simply consulting with a mental health expert in the first instance, to find him ineffective for failing to do so would promote costly defensive lawyering focused not on the specifics of the case counsel is actually defending but

on the avoidance of post-trial allegations of ineffectiveness.

I must emphasize that I make my determination regarding FitzGerald's performance independent of the state court rulings. In denying Rosado's ineffective assistance of counsel claim on the motion for a new trial, Judge Hely found that counsel's performance in court was effective and competent:

> The defendant was vigorously and skillfully represented at trial by [counsel, who] is an energetic and highly experienced criminal trial attorney. He has been competently representing defendants in murder and other serious felony cases for many years. I have nevertheless carefully considered the specific circumstances of this case in assessing the defendant's ineffective assistance claim. . . .
>
> [Counsel] conducted a highly skilled cross-examination of the medical examiner. . . . During the cross-examination, [counsel] displayed an impressive knowledge of the technical medical issues. . . . In his closing, [counsel] vigorously and skillfully pressed the argument that Greene survived the defendant's beating and that asphyxiation by Babbitt was the cause of death. A better presentation by any attorney could not be expected on the evidence in this case. . . . [Counsel] combined [the argument that Babbitt caused the victim's death] with a vigorous attack on the credibility of the main prosecution witness. He simultaneously and competently presented the evidence of the defendant's frequent intoxication, including on the night of the beating. There was no incompetence, serious or minor.

R. 147–50 (internal citations omitted).

 But Judge Hely's observation that counsel performed well in the courtroom would not be inconsistent with a

finding of deficient performance. The question before me is not whether counsel competently presented the defenses that he *did pursue*, but rather whether it was incompetent of him *not to pursue* others. The Sixth Amendment inquiry is not an overall assessment of whether an attorney is generally competent; one may conduct an excellent cross-examination of a medical examiner and make a superb closing argument, yet nevertheless render ineffective assistance by failing to investigate an insanity defense. *Cf. Edwards,* 488 F.2d at 1164–65 (holding that, even though counsel's "representation was professional and adequate" in general, it was deficient as to the "the critical issue of sanity and more narrowly as to adequate psychiatric assistance in relation to that issue").

Judge Hely and the SJC, in holding that FitzGerald's conduct fully satisfied the Constitution, relied on grounds that I find to be incomplete. They focused primarily on the intoxication defense presented by FitzGerald and his skill in the courtroom (and, in the case of the SJC, the mistaken notion that FitzGerald had investigated the insanity defense and chose not to pursue it in trial).

Judge Hely and the SJC viewed Fitz-Gerald's presentation of the intoxication defense as obviating the need for expert testimony. They observed that counsel "did not overlook the intoxication theory altogether, but instead effectively presented it through lay testimony." *Rosado,* 434 Mass. at 201, 747 N.E.2d 156. Indeed, FitzGerald adduced lay testimony that Rosado was often drunk, and was so on the night of the beating. It is also true, as Judge Hely observed, that at trial the court "actually gave an intoxication instruction twice."

As presented, the intoxication "defense" amounted to a negation of specific intent, *i.e.,* that Rosado could not have formed the specific intent necessary for first degree murder because he was voluntarily intoxicated. The defense that Rosado now maintains should have been investigated is *insanity,* which is a complete—not a partial—defense. *See Genius,* 50 F.3d at 61. Rosado argues that he should have been assessed for several psychiatric disorders, and at the evidentiary hearing, Dr. Paul Spiers, a neuropsychologist retained by Petitioner for collateral attack on the conviction, opined that Rosado may have suffered from alcohol induced mood disorder and anti-social personality disorder.

■ If an expert had examined Rosado before trial, and if the expert had concluded that Rosado was afflicted with one of these disorders, such that he lacked capacity to understand or conform to the law, then counsel might have elected to pursue, not simply an "intoxication" defense that sought to negate *mens rea* by virtue of intoxication, but a full *insanity* defense. That defense seeks a verdict of "not guilty by reason of insanity," a distinct verdict option in Massachusetts that jurors may return if they find that "at the time of the offense, as a result of mental disease or defect, the defendant lacked the substantial capacity to understand the criminality [wrongfulness] of his conduct or lacked the substantial capacity to conform his conduct to the requirements of the law." *Commonwealth v. McHoul,* 352 Mass. 544, 547, 226 N.E.2d 556 (1967). That is a defense that could *not* have been effectively presented through lay testimony.

Nevertheless, having now considered all these factors in full context, I find no departure from professional norms in Fitz-Gerald's decision not to explore further a full insanity defense. As the First Circuit ultimately observed in *Genius,*

> In many criminal cases, there are (in the abstract) numerous possible defenses. Even when there is no need for an expert or the costs of an expert are borne

by the state, pursuing any line of inquiry involves some use of time and distracts in some degree from other possible defenses that might be pursued. As the Eleventh Circuit has said, "counsel ... is not required to pursue every path until it bears fruit or until all available hope withers."

147 F.3d at 67 (quoting *Solomon v. Kemp,* 735 F.2d 395, 402 (11th Cir.1984), *cert. denied,* 469 U.S. 1181, 105 S.Ct. 940, 83 L.Ed.2d 952 (1985)).

In conclusion, I find that while Petitioner may have exhibited signs of psychological disorders and further investigation might have developed additional support for a mental health defense, counsel's decision not to investigate an insanity defense fell within the standard of competent representation set forth in *Strickland.* This finding with respect to competency is itself determinative of the ineffectiveness claim. Nevertheless, in the interests of completeness, I will address the prejudice prong of the ineffectiveness claim as well.

### 3. *Prejudice*

█ Prejudice is also a mixed question of law and fact. *Strickland,* 466 U.S. at 698, 104 S.Ct. 2052; *Ruiz v. United States,* 339 F.3d 39, 42 (1st Cir.2003). None of the circumstances where prejudice may be presumed are applicable here. *See Ouber,* 293 F.3d at 33. I must therefore determine whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052; *Castillo v. Matesanz,* 348 F.3d 1, 11 (1st Cir.2003), *cert. denied,* 543 U.S. 822, 125 S.Ct. 30, 160 L.Ed.2d 32 (2004).

The prejudice inquiry in this case is informed in part by evaluation of the substance of the views of psychological experts presented before me but unavailable to the state courts. Two experts testified in the evidentiary hearing before me: one, Dr. Spiers, for Petitioner, and one, Dr. Rogers, for the Commonwealth.

### a. *Dr. Spiers' Live Testimony Elicited By the Parties*

Paul A. Spiers, Ph.D., a neuropsychologist called by Petitioner, met with Rosado on June 24, 2004. After taking a detailed history and conducting an examination, Dr. Spiers concluded that Rosado likely suffered from anti-social personality disorder, alcohol-induced mood disorder, and a learning disability related to spelling. Rosado's school record also suggested to Dr. Spiers that Rosado had ADHD as a child.

The only one of these diagnoses that could have significantly affected Rosado's judgment at the time of the beating is alcohol-induced mood disorder. Dr. Spiers testified that Rosado's tendency to become violent when intoxicated and his history of blackouts reflected an idiosyncratic response to alcohol. According to Dr. Spiers, individuals who have an idiosyncratic response experience amplified effects of alcohol. Although he agreed that inappropriate aggression, impaired judgment and impaired social functioning are general features of intoxication, Dr. Spiers opined that Rosado's long history of drunken violent behavior most likely indicates an idiosyncratic response to alcohol.

Given that diagnosis, Dr. Spiers suggested that Rosado may have been experiencing an alcoholic blackout when he beat the victim. Dr. Spiers explained that in a blackout, an individual appears to be functioning normally, but has no memory of his actions. In this condition, the individual can be said to "act[ ] unknowingly or act[ ] in a manner which seems purposeful, but they have no recall of what has happened afterwards." Although Dr. Spiers acknowledged that Rosado's ability to recall

details of the beating was inconsistent with a blackout state, he said:

> Mr. Rosado explained to me that his attorney had represented to him that it would not be in his best interest to say he forgot what happened. And, so, he represented to me that he, in fact, made up these details.

### b. *Dr. Spiers' Two Contradictory Opinions Submitted to the Court*

At the evidentiary hearing after counsel had completed their examinations, I asked Dr. Spiers directly—because neither of the parties had—whether he could say to a reasonable degree of scientific certainty that at the time of the offense, Rosado, as a result of a mental disease or defect, lacked the substantial capacity to understand the criminality or wrongfulness of his conduct or lacked the substantial capacity to conform his conduct to the requirements of the law. Dr. Spiers answered that while he hypothesized that Rosado did not have such capacity, he could not say so to a reasonable degree of scientific certainty.[9]

Less than two weeks after the hearing, Dr. Spiers submitted an unsolicited affidavit announcing the opposite conclusion. He wrote:

> [A]t the time of the subject offense in this case, Mr. Rosado was suffering from a mental disease or defect, to wit an alcohol-induced blackout. As a result of this mental defect, he most definitely would have lacked the substantial capacity to conform his conduct to the requirements of the law. In addition, in the mental state that typically accompanies a blackout, Mr. Rosado's ability to appreciate the wrongfulness of his actions was probably also significantly compromised.

Spiers Affidavit at ¶ 7 (Mar. 21, 2005).

In "Petitioner's Motion to Have Contents in Affidavit of Paul A. Spiers, PH.D. in Clarification of Testimony Given At March 10, 2005 Evidentiary Hearing Received By the Court and Admitted As Additional Evidence with Respect to the Evidentiary Hearing," Rosado's counsel suggests that Dr. Spiers "clarifies and explains in his affidavit, as undersigned counsel would have had him do if allowed to redirect." The suggestion that counsel was somehow not allowed to question Dr. Spiers after my inquiry is misleading. My question to Dr. Spiers and his response was followed by my inquiry of both counsel, who had earlier been permitted to conduct their own questioning of him,[10] "Anything further on that?" Neither re-

---

9. Q. THE COURT: But let me be clear on this. You cannot say to a reasonable degree of scientific certainty that at the time of the offense, Mr. Rosado, as a result of a mental disease or defect, lacked the substantial capacity to understand the criminality of wrongfulness of his conduct or lacked the substantial capacity to conform his conduct to the requirements of the law?
A. DR. SPIERS: Your Honor is correct. That would be my hypothesis, but I could not say—I would not say it at this time. 3/10/05 Tr. at 93.

10. Apparently Rosado's counsel seeks to conflate the limits I placed on examination by counsel before I put my own question, with the failure to take up the invitation I extended thereafter to pursue "Anything further [within the scope of my inquiry]." It is my practice, in the absence of special circumstances, to afford the opportunity respectively to direct, cross, redirect and recross examination limited in the latter three instances to the scope of the opposing parties' previous examination. When Rosado's counsel began what he described as "doing redirect," (actually re-redirect), I stopped him by observing, "Two to a customer ... We've been over this." But there was no limit imposed, in fact specific inquiry was made as to counsel's intention, regarding follow up on my subsequent inquiry of Dr. Spiers.

sponded. In any event, I will allow the motion to admit Dr. Spiers' affidavit for what it is worth.[11]

Counsel's explanation for Dr. Spiers belated affidavit contradicting his live testimony was,

> When Dr. Spiers said to the court that a present sense statement in according to McHoul would be his hypothesis, he was saying that based upon what he knew, it would provide a reasonable basis for further investigation, but of course time had passed. That is why he states a clarification as in his affidavit.

Dr. Spiers' explanation is a bit different. He states,

> [I]f I had the opportunity to examine and evaluate Mr. Rosado in the pretrial state court time period, when I would have had access to all of the pertinent information then available, it would have been my professional opinion at that time, as it is now, [that Rosado met the *McHoul* standard].

#### c. *Dr. Rogers' Testimony During Hearing*

The Commonwealth's expert, psychiatrist Malcolm P. Rogers, examined Rosado in January 2005, and like Dr. Spiers, diagnosed him with anti-social personality dis-

order and a possible learning disorder. However, finding that Rosado's response to alcohol was not significantly different from other alcoholics, Dr. Rogers concluded that Rosado did not suffer from alcohol induced mood disorder or an idiosyncratic response to alcohol.

Dr. Rogers also disagreed with Dr. Spiers that a blackout could have rendered Rosado incapable of knowing the wrongfulness of his actions or unable to conform his actions to the law. Dr. Rogers defined a blackout as a memory deficit unrelated to the ability to make conscious decisions. In other words, it was his view that an individual who blacks out may not remember what he did the night before, but that this does not mean he did not know what he was doing at the time he did it or was otherwise incapable of conforming his actions to the law.

#### d. *Prejudice*

■ I do not find that expert testimony by Dr. Spiers would have resulted in a different outcome in the state court trial. While I recognize Dr. Spiers has been instrumental in the development of the use of alcohol-induced disorder as a basis for a mental health defense in Massachusetts, his expert opinion—self-contradictory as presented before me—appears without significant force when applied to Rosado.[12]

---

11. The Commonwealth has opposed the admission of the post-hearing Spiers affidavit analogizing to the well-established principle that "when an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." *Torres v. E.I. Dupont De Nemours & Co.*, 219 F.3d 13, 20 (1st Cir.2000)(internal quotations and citations omitted). While the *post hoc* affidavit rule makes sense in the summary judgment context, where the inquiry turns on the presence of disputed facts, I decline to extend it to an evidentiary hearing in which I am charged with making determinations regarding prejudice. *Cf. Mahan v. Boston Wa-*

*ter and Sewer Com'n,* 179 F.R.D. 49, 57 (D.Mass.1998) (rejecting the extension of the sham affidavit rule to post-deposition affidavits of non-deposed, non-party affiants in part because doing so would "turn[ ] summary judgment into a trial on the merits"). The contradictory opinions of Dr. Spiers nevertheless may be assessed for purposes of determining what the likelihood is that such a set of opinions would have influenced the jury's conclusion sufficiently to result in a different result in the proceeding.

12. Indeed, I question whether, given Rosado's repeated longterm voluntary abuse of alcohol and history of aggressive behavior, Dr. Spiers' ultimate post-hearing insanity opinion standing alone would be sufficient to support a successful insanity defense. The standard

Of course, one can hardly fault Rosado's post-trial counsel for undertaking to make use of it. It appears that the success of this theory in securing a new trial in *Commonwealth v. Roberio*, 428 Mass. 278, 700 N.E.2d 830 (1998) ("*Roberio I*"),[13] prompted counsel for Rosado to raise the claim in Rosado's state court new trial motion filed shortly thereafter and reach out to Dr. Spiers for his expert opinion.

But having fully explored in broadest context what the expert testimony would be, I find that it would not have created a different result for Rosado. *See, e.g., Commonwealth v. Parker*, 420 Mass. 242, 246–46, 649 N.E.2d 727 (1995) (rejecting ineffective assistance new trial motion based on failure to present expert mental health testimony supported by the opinion of Dr. Spiers "that the defendant's actions appear, to a reasonable degree of scientific certainty to have been impulsive and a result of diminished inhibition and capacity to modulate his behavior as a result of intoxication" because this "expert testimony would not likely have influenced the jury's conclusion that, at the time of the killing, the defendant had the *mens rea* necessary for a conviction of deliberately premeditated murder in the first degree"). I am satisfied that, as in *Parker* and *Roberio II, see* note 13 *supra*, Dr. Spiers' evidence—even considering only so much of it as ultimately stated an opinion to a

Massachusetts criminal jury instructions direct that:

> you may consider whether the defendant's voluntary consumption of drugs or alcohol activated a latent mental disease or defect apart from the addiction itself. If, as a result of the activation of that latent mental disease or defect, the defendant lost the substantial capacity to understand the wrongfulness of (his/her) conduct or to conform (his/her) conduct to the requirements of the law, the defendant would lack criminal responsibility. However, if the defendant knew or subjectively had reason to know under the circumstances that (his/her) use of drugs or alcohol would activate the latent mental disease or defect, (he/she) may not rely on that disease or defect to assert a lack of criminal responsibility. In deciding what the defendant subjectively had reason to know, you should consider the question solely from the defendant's point of view, including (his/her) mental capacity.
>
> Thus, if the Commonwealth has proved beyond a reasonable doubt that the defendant knew or had reason to know that (his/her) consumption of drugs or alcohol would activate a mental disease or defect, then you must find that the defendant was criminally responsible for (his/her) actions. It is not necessary that the defendant knew or had reason to know that (he/she) had a mental disease or defect as long as (he/she) knew (his/her) voluntary consumption of drugs or

alcohol would trigger inappropriate conduct.

Massachusetts Superior Court Criminal Jury Instructions § 3.1.1(b) (MCLE Inc.1999 & Supp.2003) (citations omitted).

In an affidavit submitted in support of his new trial motion in state court, Rosado reports telling FitzGerald that:

> I began drinking since I was about 14 years old, that I had been in trouble many times, that I had been in many fights, all because of my drinking, and that I believed that just about all of my arrests had to do with alcohol.

Given such information, it is unlikely Rosado could overcome the argument that he knew or had reason to know that his purported mental disease or defect arising from voluntary consumption of alcohol would trigger inappropriate conduct.

13. The Supreme Judicial Court in *Roberio I* treated as immaterial the trial judge's determination "that a new trial was not needed because, in his view, the psychologist [Dr. Spiers] was not credible"; the Court held "the issue of credibility was for a jury, not the judge." *Id.* at 281, 700 N.E.2d 830. I note that on retrial Roberio was again convicted by a jury which like the new trial motion judge in *Roberio I* apparently did not credit Dr. Spiers opinion that alcohol use contributes to a lack of the "substantial capacity to conform his conduct to the requirements of the law." *Commonwealth v. Roberio*, 440 Mass. 245, 247 n. 3, 797 N.E.2d 364 (2003) (*Roberio II*).

reasonable degree of scientific certainty—would not have influenced the jury's conclusion and consequently that its absence caused Rosado no prejudice.

## C. Ground Two: Denial of Funds to Obtain an Expert

] Rosado next contends that the trial judge erred by refusing his post-trial request for funds to aid in pursuit of his ineffective assistance of counsel claim. As the SJC observed in *Rosado*, however, Massachusetts law at the time [14] did "not authorize a judge to allow costs in connection with the presentation of a new trial motion based on a claim of ineffective assistance of counsel." *Rosado*, 434 Mass. at 201 n. 7, 747 N.E.2d 156 (quoting *Commonwealth v. Carter*, 429 Mass. 266, 270, 708 N.E.2d 943 (1999)). Nor is there a federal constitutional right to have such funds. The Supreme Court case that Rosado repeatedly invokes in support of his claim, *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), concerned a defendant's right to have access to a psychiatrist's assistance at *trial*, not on post-conviction review. The practice in the Massachusetts state courts of deferring direct appellate review when a motion for a new trial is filed during its pendency in order to permit consolidated appellate proceedings does not transform a Rule 30 post-conviction attack into direct review of trial proceedings. Standing alone, there was no *federal constitutional* error in the state court's application of the then-applicable rules for resource allocation to Rule 30 collateral attack proceedings. I find Ground Two fails as an independent basis for the writ.

## D. Ground Five: Failure to Instruct on Manslaughter

In Ground Five, Rosado contends that the trial judge's failure to instruct the jury on voluntary manslaughter violated the due process guarantee of the Fourteenth Amendment.

] In Massachusetts, a voluntary manslaughter charge is required where a reasonable jury could find "a killing from a sudden transport of passion or heat of blood, upon a reasonable provocation and without malice, or upon sudden combat." *Commonwealth v. Little*, 431 Mass. 782, 786, 730 N.E.2d 304 (2000). For a jury to find that a defendant's intent to kill arose from such circumstances, it must find evidence that

> would warrant a reasonable doubt that something happened [i.e., provocation] which would have been likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint, and that what happened actually did produce such a state of mind in the defendant.

*Rosado*, 434 Mass. at 205, 747 N.E.2d 156 (alterations in original) (quoting *Little*, 431 Mass. at 786, 730 N.E.2d 304).

 The SJC determined that such a charge was not justified in this case. *See Rosado*, 434 Mass. at 204–05, 747 N.E.2d 156. The SJC held that, even assuming "the version of the facts most favorable to the defendant," such an instruction was "not warranted because no reasonable jury could possibly find any of the mitigating factors justifying a reduction from murder to manslaughter." *Rosado*, 434 Mass. at

---

14. I note that Mass. R.Crim. P. 30(c)(5) was amended effective October 1, 2001, to authorize the allowance of costs associated with new trials. This change in availability of expert funds for new trial motions, however, did not apply to Petitioner's case, as the SJC rendered its opinion on May 18, 2001 and July Hely's denial of the motion for costs was filed on June 1, 1999.

204, 747 N.E.2d 156. The court reasoned that "[t]he victim's efforts to expel the defendant from his premises can hardly be deemed 'reasonable provocation' for the inhumane beating that ensued." *Rosado,* 434 Mass. at 205, 747 N.E.2d 156. Moreover, a "sudden combat" or "reasonable provocation" theory could not be maintained "to the extent that the evidence presented a joint venture lasting over a period of four days." *Id.* I find no reason to disagree with the SJC's reasoning on this issue.

 More fundamentally, these instructions cannot, without more, provide grounds for federal habeas corpus relief. "Instructions in a state trial are a matter of state law to which substantial deference is owed," and, thus, "[a]s a general rule, improper jury instructions will not form the basis for federal habeas corpus relief." *Niziolek v. Ashe,* 694 F.2d 282, 290 (1st Cir.1982). Relief through a habeas corpus petition is proper only where " 'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.' " *Estelle v. McGuire,* 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (quoting *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)).

 The challenged instruction must be viewed in the context of the entire trial and the jury instructions as a whole to determine whether the jury has applied the instruction such that a substantial miscarriage of justice has occurred. *Estelle,* 502 U.S. at 72, 112 S.Ct. 475; *Mayfield v. Maloney,* 749 F.Supp. 1151, 1159 (D.Mass.), *aff'd,* 923 F.2d 839 (1st Cir.1990) (per curiam) (unpublished table decision). Based on the lack of provocation on the victim's part, as well as the length of time that the joint venture continued, an in-

struction regarding voluntary manslaughter would appear to have been unwarranted under state law and, more pertinently, its absence creates no due process violation under federal constitutional law.

### E. *Ground Six: Errors in Jury Instructions*

Ground Six pertains to "all of the grounds herein based on jury instruction errors," which, in the current petition, includes only Ground Five.[15] In light of the fact that I have rejected Ground Five as a basis for habeas corpus relief, *see supra* Section II.D., the petition contains no surviving allegations of faulty jury instructions. Consequently, the alleged errors expressed in Ground Six—that each "lack of instruction or faulty instruction had the effect of diminishing the Commonwealth's burden of proof beyond a reasonable doubt as to all fact-elements necessary to convict"—have no independent substance.

### III. CONCLUSION

For the reasons set forth above, after exhaustive, time consuming and extended evaluation of the state court record and supplementary evidentiary development in this court, I hereby ORDER that this petition for habeas corpus relief be DENIED and the petition be dismissed.

---

**15.** In the original petition to the court, Grounds Three and Four also concerned alleged jury instruction errors. They are not pressed here by Petitioner because they were not exhausted in state court. *See supra* Note 4 and accompanying text.