## COMMONWEALTH *vs.* MESHACH LITTLE.

Suffolk. May 5, 2000. - June 21, 2000.

Present: MARSHALL, C.J., ABRAMS, GREANEY, SPINA, & COWIN, JJ.

*Homicide. Practice, Criminal,* Capital case, Instructions to jury. *Malice. Self-Defense.*

At a murder trial, the evidence was sufficient to warrant the jury's finding beyond a reasonable doubt that the defendant had acted with the malice necessary for conviction of murder in the first degree by reason of extreme atrocity or cruelty. [783]

On the state of the evidence at a murder trial, the defendant was entitled to instructions to the jury on self-defense, voluntary manslaughter, and the use of excessive force in self-defense: where the judge's instructions to the jury on provocation were not only incorrect regarding the Commonwealth's burden of proof, but also contradictory and confusing, and where the errors were compounded by the judge's answers to the jury's questions during deliberations, a substantial likelihood of a miscarriage of justice was created and a new trial was required. [783, 785-791]

INDICTMENT found and returned in the Superior Court Department on May 22, 1996.

The case was tried before *Vieri Volterra*, J.

*Linda J. Thompson* for the defendant.

*Christopher Pohl*, Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury in the Superior Court convicted the defendant of murder in the first degree on the theory of extreme atrocity or cruelty and of unlawful possession of a firearm.[1] He

---

[1]The jury were instructed on both deliberate premeditation and extreme atrocity or cruelty, and they rested their verdict on the indictment charging murder in the first degree only on the latter. The defendant does not challenge his conviction and sentence on the firearm charge, and we shall affirm that conviction. Immediately after he was sentenced on the murder and firearm convictions, the defendant was found to be in violation of his probation on three prior convictions and portions of his sentences on those convictions that had been suspended were ordered into effect. The defendant does not question the imposition of these sentences, and we do not consider them.

is represented by new counsel on appeal. We conclude that errors in portions of the instructions to the jury on voluntary manslaughter created a substantial likelihood of a miscarriage of justice. Accordingly, we reverse the defendant's conviction of murder in the first degree and remand that indictment for a new trial.

1. There was no dispute that the defendant shot and killed the victim during an argument. The main issues at trial were whether the defendant had committed murder or acted in self-defense, or, if the killing was unlawful, whether the defendant was guilty only of manslaughter. We reject at the outset the defendant's argument that he was entitled to a required finding of not guilty on the charge of murder in the first degree because the evidence pertaining to sudden combat, provocation, and the use of excessive force in self-defense, as matter of law, negated the malice necessary to find murder in the first degree by reason of extreme atrocity or cruelty. The evidence in the Commonwealth's case, considered under the standard governing a motion for a required finding of not guilty, see *Commonwealth* v. *Gunter*, 427 Mass. 259, 264-265 (1998), and cases cited, was sufficient to warrant the jury's finding that the Commonwealth had proved, beyond a reasonable doubt, that the defendant had acted with the malice necessary to convict him of murder in the first degree by reason of extreme atrocity or cruelty.

2. The dispositive issue in this case concerns the correctness and effect of portions of the judge's instructions on voluntary manslaughter. The Commonwealth acknowledges that there were errors in the manslaughter instructions, but maintains that they are of no legal significance because the defendant was not entitled to instructions on the disputed points, and, even if he was so entitled, the instructions, considered as a whole, could not have misled the jury.

We must first summarize the evidence most favorable to the defendant on the issues of self-defense and voluntary manslaughter, because it is from that viewpoint that we assess the need for, and adequacy of, the criticized jury instructions. See *Commonwealth* v. *Barros*, 425 Mass. 572, 575 (1997); *Commonwealth* v. *Walden*, 380 Mass. 724, 726 (1980).

In the early evening of January 26, 1996, the defendant and a friend (Jesse Calhoun) encountered the victim (Vishon Robinson) and three of Robinson's friends (Christopher Steele, Regina DePina, and Yolanda DePina), in the Jamaica Plain section

of Boston. The defendant was on crutches, and his left foot was in a cast, due to a recent operation. The defendant, aware that Robinson had a dispute with Calhoun over cocaine, warned Calhoun to "[p]ull [Robinson] around the corner, talk to him in private, so he don't . . . try to get loud or stuff." Calhoun and Robinson went around the corner to talk "in private." When they reappeared, they were arguing, with Robinson, who was over six feet tall, challenging Calhoun, who was approximately five feet, four inches, tall, to a fight. Some words were exchanged about "straps" (weapons). When Robinson tried to "walk up on" Calhoun, the defendant told Robinson to leave Calhoun alone, and swung one crutch at Robinson, without hitting him. Robinson then turned on the defendant. At this point, Calhoun's sister called from the window of his third-floor apartment in a nearby building for Calhoun and the defendant to come upstairs. Robinson said to the defendant, "I'll be right back. Wait right there." The defendant responded, "Man, you better go ahead, before you don't have a chance to come back," and opened his jacket to show Robinson that he had a handgun.[2] Testifying for the Commonwealth, Steele stated that he saw a black handle and warned Robinson that the defendant had a handgun. Robinson left, yelling, "Whatever, you want to bring weapons into it, we can bring guns and knives, whatever. I'll see you then." The defendant told Robinson to "[j]ust leave it alone, man. Leave us alone. You know what I'm saying. Go ahead." The defendant and Calhoun then went up to Calhoun's apartment.

Upstairs in the apartment, the two listened to music and kept watch by the window, waiting for the crowd still out in front of the building to leave. The defendant testified that he knew Robinson as "one of the guys that hang around that area" and knew that he carried a handgun. (Calhoun testified that Robinson sold drugs and carried a handgun, and Steele also stated that Robinson had carried a handgun in the past.) After a short time, satisfied that there was no one outside, the defendant and Calhoun left the apartment. The two were walking along the sidewalk when an automobile pulled past them and slowed. Before the automobile had fully stopped, Robinson got out. Four of Robinson's friends (Steele, Yolanda and Regina DePina, and Danielle Smith) also got out, and the driver drove away.

[2]The defendant testified that he had bought the handgun for fifty dollars from a "dope fiend" in late September, 1995, and, although he had carried it since that time, he had never fired it before the night of the shooting.

The defendant testified that he was nervous, because he thought that Robinson was going to start shooting as soon as he got out of the automobile. According to Steele, Robinson approached the defendant, yelling, "I'll fuck you up," and the defendant told Robinson, "You better go ahead." Robinson kept advancing on the defendant, saying, "Go ahead what? We can do this however you want to do this." Again, the defendant told him to "leave it alone." The defendant testified that "he kept coming towards me." The defendant unzipped his jacket and put his hand inside, and warned Robinson not to "come close on [him] like that." When Robinson kept coming, the defendant, balanced on one crutch, pulled his handgun out and pointed it at Robinson, who had his hands in his pockets. The defendant, thinking "[Robinson] was going to come out with a gun," pulled the handgun's hammer back.

The defendant testified that he was scared, because he was in a strange neighborhood and he could tell that Robinson was "high." (There was medical evidence that Robinson had cocaine in his system when he was killed, and the Commonwealth stipulated that the victim, at a hospital, "spit out five small bags of white powder," believed to be crack cocaine.) Aware that Robinson knew the defendant had a handgun, the defendant believed that Robinson had returned in the automobile to shoot him. The defendant stated, "Yo, man. Go ahead, man" (meaning to leave him alone).

Robinson then "made a motion like he was going for his hip." At trial, the defendant demonstrated this motion for the jury, explaining that Robinson went back with his hand to his back. The defendant thought, "If he gets that gun, he [is] going to shoot me," and began shooting. The defendant fired seven shots from his semiautomatic handgun in rapid succession. Then, still on crutches, he ran. No handgun was found on the victim, who died later that night at a hospital.

In *Commonwealth* v. *Berry, ante* 326, 334 (2000), we recently stated the principles on when, in a murder case, instructions on voluntary manslaughter are required:

> " 'If any view of the evidence . . . would permit a verdict of manslaughter rather than murder, a manslaughter charge should be given.' *Commonwealth* v. *Brooks*, 422 Mass. 574, 578 (1996). One of the mitigating circumstances that would render the crime a voluntary 'man-

slaughter . . . [is] a killing from a sudden transport of passion or heat of blood, upon a reasonable provocation and without malice, or upon sudden combat.' *Commonwealth* v. *Walden*, 380 Mass. 724, 727 (1980), quoting *Commonwealth* v. *Soaris*, 275 Mass. 291, 299 (1931). 'In order for a jury to find that a "defendant formed an intent to kill in a transport of passion or in the heat of blood, . . . [t]here must be evidence that would warrant a reasonable doubt that something happened [i.e., provocation] which would have been likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint, and that what happened actually did produce such a state of mind in the defendant." ' *Commonwealth* v. *Amaral*, 389 Mass. 184, 188 (1983), quoting *Commonwealth* v. *Walden*, *supra* at 727-728. *Commonwealth* v. *Pitts*, 403 Mass. 665, 667 (1989)."

We conclude, based on the evidence most favorable to the defendant, that he was entitled to instructions on self-defense, voluntary manslaughter, and the use of excessive force in self-defense. The Commonwealth's own evidence was that the victim was the aggressor in the incident that led to his death. It is undisputed that the victim advanced on the defendant, who was on crutches, despite his knowledge that the defendant was armed, while the defendant urged him to leave. The defendant testified that he was scared because he believed that the victim, who was known by the defendant to have carried a handgun in the past, had a handgun and that he was going to use it. The victim made a move with his hand to his hip, as if he were reaching for a handgun. This evidence would permit the jury to find that the defendant had a reasonable belief that he was in imminent danger of being killed or seriously injured with no reasonable means of escape, and so acted in self-defense.[3] The jury might also find that, as a result of the victim's hostile

---

[3]We reject the Commonwealth's assertion that the defendant was not entitled to a self-defense instruction because he did not put forth evidence that he took every opportunity to avoid combat. It is undisputed that the defendant tried to talk the victim out of fighting. Cf. *Commonwealth* v. *Niemic*, 427 Mass. 718, 722 (1998). Whether the defendant could have retreated (or should have attempted to), on crutches, from the handgun he believed the victim possessed, was a question for the jury. See *Commonwealth* v. *Harrington*, 379 Mass. 446, 452 (1980).

behavior, the defendant shot his handgun in the heat of passion, provoked by the above circumstances. Cf. *Commonwealth* v. *Medina*, 430 Mass. 800, 809-810 (2000) (nothing to suggest that circumstances would produce state of passion, anger, fear, fright, or nervous excitement in ordinary person and no indication that defendant subjectively experienced this impassioned state of mind). The Commonwealth is correct that "words alone are insufficient provocation to reduce murder to manslaughter." *Commonwealth* v. *LeClair*, 429 Mass. 313, 316 (1999). Here, the situation of escalating tension described by the defendant (including his belief that the victim was "high"; his belief that the victim had a handgun; and the victim's move as if to draw his handgun) was not based solely on the victim's verbal challenges.

Based on these circumstances, "[t]he judge should have told the jury in some form 'that, if the Commonwealth had not proved the absence of provocation beyond a reasonable doubt, there could be no finding of malice and hence no conviction of murder.' *Commonwealth* v. *Boucher*, 403 Mass. 659, 661 (1989). Malice and adequate provocation are mutually exclusive. *Id.* at 661-662. See *Ariel A.* v. *Commonwealth*, 420 Mass. 281, 285 (1995)." *Commonwealth* v. *Acevedo*, 427 Mass. 714, 715-716 (1998). The evidence also required the judge to instruct on self-defense. The jury should have been told that self-defense, if warranted by the circumstances and carried out properly, constitutes a complete defense and not merely a mitigating circumstance. See *Commonwealth* v. *Mejia*, 407 Mass. 493, 496 (1990). The jury should also have been told that, if the defendant used excessive force in an otherwise appropriate exercise of self-defense, and that, if death resulted from the use of excessive force, he should be found guilty of manslaughter. *Commonwealth* v. *Torres*, 420 Mass. 479, 491-492 (1995).

The instructions given the jury on self-defense and on voluntary manslaughter when a defendant uses excessive force were basically correct. However, the instructions on provocation considerations involved in voluntary manslaughter contained infirmities, along with some correct instructions, and the infirmities were compounded as the jury deliberated the case. We set forth the problems.

(a) On the issue of provocation, the judge in his main charge gave the instruction which we concluded was erroneous in *Commonwealth* v. *Acevedo, supra,* because it misplaced the burden

of proof. In *Acevedo*, we observed that the difference between a correct instruction on provocation, and the incorrect one given here, is "substantial." *Id.* at 717. We stated that the erroneous instruction, even if it followed instructions that correctly stated the burden of proof, "could only have misled" the jury. *Id.* We also indicated in *Acevedo*, a case of murder in the second degree, where there was, as there is here, a legitimate issue as to provocation, that "we [had] doubt that the error posed no substantial risk of a miscarriage of justice." *Id.*[4]

Further, just before the jury received the case, one of the jurors asked, "Are we going to be given copies of the judge's instructions?" The judge told the jury that they would not receive a copy because "[i]n Massachusetts each judge creates his own instructions. So I have all interlineations, little notes, case citations, which would be improper for me to submit to you." These latter remarks will be touched on in section (c) below.

(b) After about three hours of deliberations, the jury asked the judge to reinstruct them on "the legal definition[s] of first and second degree murder, and voluntary manslaughter." The judge did so, and in the course of the supplemental instructions on voluntary manslaughter, he again gave the same incorrect instruction on the burden of proof as to provocation. In so doing, the judge gave contradictory and confusing instructions that told the jury that they could find the defendant guilty, if the Commonwealth had not met its burden of proof on provocation, and not guilty if the Commonwealth had failed in its burden of proof on the issue.

(c) After further deliberations, the jury asked the judge, "Can mitigating circumstances reduce the charge of murder to manslaughter?" The judge responded to the jury's question by sending to them a written copy of his entire instructions on voluntary manslaughter. In changing his mind about his earlier refusal to give the jury a written copy of his instructions, the judge furnished them with the printed text of the erroneous

---

[4]*Commonwealth* v. *Acevedo*, 427 Mass. 714 (1998), was decided after the trial in this case. However, the holding there was stated in substantially similar terms in *Commonwealth* v. *Boucher*, 403 Mass. 659, 663 (1989), where we said: "[T]he judge's omission [not making clear to the jury that, if the Commonwealth had not proved the absence of provocation beyond a reasonable doubt, there could be no malice and hence no conviction of murder] created the significant possibility that the defendant was erroneously convicted of murder in the first degree instead of manslaughter."

burden of proof instructions on provocation in voluntary manslaughter.

(d) The jury continued to deliberate, and then asked the judge, "Can we have written instructions for first and second degree murder?" The judge complied with this request by sending to the jury written instructions on the elements of murder in the first degree (both by premeditation and by extreme atrocity or cruelty, because the jury were considering both theories, see note 1, *supra*), and the elements of murder in the second degree. Unlike the written instructions on voluntary manslaughter furnished by the judge a short time before, the written instructions on murder in the first and second degrees contained numerous citations to decisions that may have given the appearance of greater authority. There also was no explanation offered to the jury as to the meaning of the citations. We think the citations may have "created a fertile source of possible confusion for lay jurors." *United States* v. *Parent*, 954 F.2d 23, 26 (1st Cir. 1992).

(e) Further along in deliberations, the jury asked additional questions, one of which was, "Can you give us more instructions on mitigating circumstances?" The judge responded by specifically directing the jury's attention to the written instructions on voluntary manslaughter that had been "sent up to the jury room." The judge also told the jury that he would furnish them with a written copy of his instructions "on the use of deadly force and self-defense." After receiving the latter materials, the jury asked the question set forth below,[5] which the judge responded to by verbal reinstruction drawn from his prior instructions on self-defense and by an additional explanation of those instructions.

We reject the Commonwealth's arguments that the proceedings and instructions described above would not have affected the jury's legally informed consideration of the merits of the murder charge. While the defendant's trial counsel stressed self-defense in his closing argument (obviously seeking acquittal), he also brought to the jury's attention that provocation was an issue.[6] The defendant's trial counsel knew, of course, at the time he made his closing argument, that the judge was going to

[5]"Does a person need to see the threat to use deadly force in self-defense, or is the mere belief that the threat exists enough to use deadly force in self-defense?"

[6]The defendant's trial counsel said the following with respect to the defendant's conduct:

instruct on the mitigating circumstances that could lead to a voluntary manslaughter verdict. The evidence in the case, viewed in the light most favorable to the defendant, was such that the several issues involved in a jury's consideration of self-defense and provocation were inextricably intertwined. The jury's questions to the judge as the deliberations progressed manifested confusion on their part, and the questions focused on what role "mitigating circumstances" should play in deciding whether the Commonwealth had proved the defendant's guilt and, if so, the degree of his guilt. The jury received erroneous verbal instructions on the Commonwealth's burden of proof, and they had, in their hands, written instructions that were wrong. That the jury's last question suggests that they may have narrowed their inquiry to the issue of the defendant's claimed exercise of self-defense does not aid the Commonwealth. We have no way of knowing whether the jury got to their last question by relying on the erroneous instructions to give less than fair consideration to the possibility of a voluntary manslaughter verdict.[7] After all, "[t]he law says . . . that the crime is voluntary manslaughter, not murder, if malice is negated by reasonable provocation or sudden combat (or at

---

"[The defendant] had a reasonable fear and a reasonable belief that [the victim] was going to pull a gun on him and shoot him. Ladies and gentlemen, that is self-defense; because you have a right to live, and you have a right to defend yourself. And it may not be moralistic, and we may judge it in a different moral way, but he's got a right to live. And if he didn't fire that gun, he might be dead; and [the victim] might be sitting here. [The victim] played that game. He knew the game, and he played it. That's self-defense. There was a fight. There was combat. There was provocation. There was self-defense."

[7]The Commonwealth relies on *Commonwealth* v. *Whitman*, 430 Mass. 746 (2000), for the proposition that the errors in the judge's instructions were harmless because, as a whole, the instructions properly conveyed the Commonwealth's burden of proof. This reliance is misplaced. The defendant in *Whitman* was convicted of manslaughter after the judge twice had given incorrect instructions to the jury on malice, similar to the instructions that were erroneous here. We affirmed the conviction, noting that, because there was no conviction of murder, the judge's misstatement on the Commonwealth's burden of proof constituted harmless error. See *id.* at 754 n.17. Unlike *Whitman*, when a defendant is convicted of murder and there is, as there was here, a legitimate issue as to provocation, a clear danger exists that the jury's verdict was the direct result of the erroneous instructions. See *Commonwealth* v. *Carlino*, 429 Mass. 692, 694-695 (1999).

least by a reasonable doubt whether those conditions were absent)." *Commonwealth* v. *Boucher*, 403 Mass. 659, 663 (1989). The defendant's right to a fair trial implicates, at least, the requirement stated in the parenthetical.

We conclude that, despite the lack of objections by the defendant's trial counsel, the judge's misstatements on the Commonwealth's burden of proof on provocation outweigh the correct instructions on the point, and give rise to a substantial likelihood of a miscarriage of justice. A new trial is required.[8] See *Commonwealth* v. *Carlino*, 429 Mass. 692, 694-695 (1999); *Commonwealth* v. *Grant*, 49 Mass. App. Ct. 169, 171-173 (2000).

3. The judgment on indictment no. 96-10885-001 is reversed, the jury's verdict of murder in the first degree is set aside, and the case is remanded for a new trial on the murder indictment. The judgment on indictment no. 96-10885-002 is affirmed.

*So ordered.*

---

[8]The defendant's appellate counsel also points to other jury instructions that are claimed to be unfair or erroneous. The instructions are troublesome, but we need not discuss them because there is clearly enough in what has already been said to require a new trial. There are no issues likely to arise at retrial that would need to be discussed.