## Commonwealth *vs.* Gabriel Espada.

Hampden. November 9, 2007. - February 20, 2008.

Present: Marshall, C.J., Ireland, Spina, Cowin, & Cordy, JJ.

*Homicide. Self-Defense. Firearms. Practice, Criminal,* Instructions to jury, Assistance of counsel, Argument by prosecutor, Comment by prosecutor. *Witness,* Impeachment.

At the trial of an indictment for murder in the first degree, the judge properly declined to instruct the jury regarding self-defense, where the defendant failed to demonstrate, based on his previous encounters with the victim and his group of associates, that he reasonably and actually believed that he was in imminent danger of death or serious bodily harm, and where, even assuming the defendant had proved such danger existed, there was no evidence that the defendant had availed himself of all proper means to avoid physical contact by retreating or attempting to retreat before initiating the confrontation in which he shot the victim. [692-694]

The defendant in a murder trial was not entitled to voluntary manslaughter instructions, where he was not justified in using deadly force in self-defense following an altercation with a certain group that included the victim [694-695]; where his alleged fear and excitement on the night of the incident did not suffice as reasonable provocation [694-696]; and where neither the victim nor anyone in the group engaged in conduct that would constitute sudden combat [696-697].

A Superior Court judge properly denied a criminal defendant's motion for a new trial, where his counsel was not ineffective for failing to question the defendant on two matters that would have allegedly demonstrated self-defense [697-698]; to object to portions of the prosecutor's closing statement that were not improper [698-699]; to cross-examine witnesses regarding matters allegedly related to self-defense [699-700]; to impeach other witnesses' credibility based on inconsistencies [700-701]; or to file a motion to suppress the defendant's statement to police, the admission of which did not lead to a substantial risk of a miscarriage of justice [701], and which furthermore was not involuntarily rendered [701-702], and was preceded by his being advised of his right to make a telephone call [702-703].

Indictments found and returned in the Superior Court Department on December 21, 2001.

The cases were tried before *John A. Agostini,* J., and a motion for a new trial, filed on September 19, 2005, was also heard by him.

*Richard J. Shea* for the defendant.

*Thomas H. Townsend,* Assistant District Attorney, for the Commonwealth.

IRELAND, J. In April, 2003, a Hampden County jury convicted the defendant, Gabriel Espada, of murder in the first degree of Nathaniel Pereira on a theory of deliberate premeditation. He was convicted of assault and battery by means of a dangerous weapon on Darius Shepard, of assault by means of a dangerous weapon on Sharif Laster, and of armed assault with intent to murder Shepard and Laster. He also was found guilty of unlawful possession of a firearm and unlawful possession of a firearm or ammunition without an identification card. The defendant appealed. In September, 2005, the defendant filed a motion for a new trial in this court, which we remanded to the Superior Court. In May, 2006, the trial judge denied the defendant's motion without a hearing. The defendant again appealed. The defendant requests that we reverse his convictions and reverse the denial of the motion for a new trial, arguing that the judge erred in refusing to instruct the jury on self-defense and voluntary manslaughter and that his trial counsel provided ineffective assistance. Because we conclude that the defendant's claims of error are without merit and discern no basis to grant relief under G. L. c. 278, § 33E, we affirm his convictions and the denial of his motion for a new trial.

*Background.* 1. *The Commonwealth's case.* We summarize the facts that the jury were warranted in finding, reserving certain details for our discussion of the issues. On November 18, 2001, two brothers, Nathaniel (Nate) and Bernabe (Bernie) Pereira, were celebrating their birthdays. Sharif Laster picked up the brothers and Phillip Langley and drove them to the apartment of another friend, Patrick Bass. Prior to their arrival at Bass's apartment, Laster had telephoned Bass to arrange to purchase twenty dollars' worth of marijuana from the defendant. When the group arrived at Bass's apartment, the defendant was present as was Iraida Rolon, Bass's girl friend. After Nate took the marijuana he told the defendant, "Now we are even." This statement led to an argument over whether the defendant owed Nate money. The argument became so heated that Rolon asked them to "go outside." Everyone but Rolon did so.

Once outside, the argument between Nate and the defendant

continued. Laster, Bass, and Langley walked toward Laster's car. The argument between Nate and the defendant escalated; Nate attempted to leave. The defendant took off his watch and made a fist with his hand down. Bernie, who was standing near the defendant, thought that the defendant was going to hit Nate, so Bernie hit the defendant in the back of the head with a liquor bottle. The defendant "backed up and . . . said, 'Oh, you guys going to jump me now?' " Bernie and Nate replied, "No, we are leaving." The defendant then stated, "I know where you live." Bernie responded by slashing one of the defendant's tires with a box cutter. Laster drove Bernie, Nate, Langley, and Bass to Laster's house.

The defendant, injured and upset, returned to Bass's apartment. Rolon asked him to leave but instead he used the telephone. During the telephone call, Rolon overheard the defendant tell the person at the other end that he had been beaten for his marijuana and that he thought that he might be "jumped," and she overheard the defendant "plead" with the person to bring him some "heat." As the defendant was leaving the apartment, Rolon heard him say to himself, "I am going to blast [them]."[1]

Meanwhile, another friend, Darius Shepard, joined the group at Laster's house. The group stayed at Laster's house for approximately one and one-half hours. They then drove back to Bass's apartment and parked the car in the parking lot behind the apartment building. At that time, the defendant's car was not there. Over the course of two to three hours, they watched television at Bass's apartment. During their stay, Rolon told them about the conversation she overheard in which the defendant requested "some heat."

Shepard was the first person to leave. He noticed that the defendant's car was parked in the back, almost blocking Laster's car. Immediately, he went back into the house and told everyone that the defendant's car was outside. Nate, Langley, and Bass went out to look around. No one saw the defendant. The group got in the car. As Laster tried "inching his way by" the defendant's car, the defendant appeared from the dumpster area. He approached the car, and hopped and banged on the trunk, yelling, "Where is Nate?" Shepard saw a gun in the defendant's

---

[1] The defendant used a racial slur to describe the group.

hand and yelled, "He's got a gun." As Laster was trying to drive away two shots were fired. After the first shot Nate began to scream, and Laster sped up in an attempt to get away. The defendant continued to fire, and Shepard was shot in the left ankle. Laster continued driving toward a hospital.

Nate died at the hospital from a gunshot wound through his back to his aorta that caused "massive bleeding." While Shepard was being treated for his gunshot wound, he identified the defendant, who had been brought to the hospital by the police, as the person who had shot at them.

The police found a spent projectile in the trunk of Laster's car and four spent casings from a .38 caliber pistol at the scene. The medical examiner also recovered a spent projectile during Nate's autopsy. The police seized a .38 caliber pistol and magazine from a garage belonging to the defendant's father. A State police ballistics expert, John Schrijn, examined the seized gun and magazine and concluded that the projectiles from the autopsy and the vehicle had been fired from the seized gun.

2. *The defendant's case.* At trial, the defendant did not deny shooting at Laster's car, killing Nate, and injuring Shepard.[2] However, he claimed he was acting in self-defense. Evidence pertinent to self-defense is viewed in the light most favorable to the defendant. See *Commonwealth* v. *Pike*, 428 Mass. 393, 395 (1998), and cases cited.

The defendant was a good friend of Bass. On the night of the incident, Bass asked him to bring some marijuana to his home. The defendant testified that he believed the debt that sparked the argument with Nate was because of an incident that occurred a week before where Nate, Bernie, and Shepard "jumped" on a "kid" who was trying to purchase marijuana. After the group beat up the "kid," some of his money fell to the ground and the defendant picked it up. The defendant later used the money to buy pizza for the group.

---

[2] At trial, the defendant's case consisted of his testimony and testimony from Langley. Langley did not recall much of what happened, at one point stating, "This was a long time ago. I'm trying to remember as best I can." However, Langley did state that during the initial altercation he told the defendant that they outnumbered him and he should not try anything. Nevertheless, the defendant's case relies heavily on his own testimony.

The argument between the defendant and Nate escalated. Nate told the defendant to hit him, but the defendant did not do so. The defendant stated that, during the argument, someone said that if the defendant did anything or tried to do anything, they would "jump" him. The defendant testified that, during the argument, Laster received a telephone call and gave the telephone to Nate. The defendant overheard Nate say something about "get[ting] the heat." After Bernie struck the defendant on the head, the defendant thought that the group was going to jump him. He returned to Bass's apartment and telephoned his brother-in-law to ask for a ride, but was told that his brother-in-law was busy. The defendant denied asking for "heat" during this telephone conversation and denied stating that he was going to "blast" anyone. The defendant drove his car down the street, parked it, and walked home. At home, the defendant cleaned up and used his brother-in-law's cellular telephone to contact an acquaintance named "Madness." He purchased a gun from Madness for his own protection.

The defendant took the gun and returned to his car to fix his flat tire. He testified that he could not change the tire because his car was on a hill, so he moved the car to an alleyway in front of a dumpster.[3] As he changed the tire he noticed that Laster's "car was back in the alleyway." The defendant saw Shepard come out and then go back inside. The defendant went to get in his car, but the whole group came outside "cussing" and talking to each other. They walked toward the defendant, and the defendant showed the group the gun at his waist. Once the defendant showed the gun, the group stopped and went to Laster's car. The defendant stated that he went behind the dumpster to avoid the car's lights as it pulled out of its parking spot. As the car pulled away, the defendant ran up to the window and asked to speak to Nate. The tinted window rolled down, and the defendant saw something "like a movement, like a reflection of somebody's hand," or a "flash." He was unsure of what he saw,

---

[3]It is not clear from the defendant's testimony where the "alleyway" was located. When asked if he backed his car and parked it in the parking lot, his response was, "I just backed it up and parked it in front of the dumpster." Based on the record, it appears as though the alleyway was located in or near the back of Bass's apartment building.

but thought it could have been "a weapon of some type." After the flash, the defendant pulled his gun and shot at the car.

The car drove off; the defendant drove to his father's house and hid the gun in the garage. At some point the police took the defendant to the hospital so that Shepard could identify him. While the defendant was at the police station he told the police where he had hidden the gun.

*Discussion.* 1. *Jury instructions.* a. *Self-defense.* The defendant claims that the judge erred in refusing to instruct the jury on self-defense. "A defendant is entitled to have the jury . . . instructed on the law relating to self-defense if the evidence, viewed in its light most favorable to him, is sufficient to raise the issue." *Commonwealth* v. *Harrington*, 379 Mass. 446, 450 (1980). There must be evidence that "permits at least a reasonable doubt that the defendant reasonably and actually believed that he was in 'imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force.' " *Commonwealth* v. *Pike*, *supra* at 396, quoting *Commonwealth* v. *Harrington*, *supra*. See *Commonwealth* v. *Barros*, 425 Mass. 572, 576 (1997). For a defendant to have such a reasonable belief, the victim must have committed some overt act constituting an assault or threat against the defendant. *Commonwealth* v. *Pike*, *supra*. See *Commonwealth* v. *Doucette*, 391 Mass. 443, 453 (1984). Moreover, there must be "some evidence that the defendant availed himself of all means, proper and reasonable under the circumstances, of retreating from the conflict before resorting to the use of deadly force." *Commonwealth* v. *Pike*, *supra* at 398. See *Commonwealth* v. *Niemic*, 427 Mass. 718, 722 (1998) (where defendant has chance to retreat but fails to do so, he has no privilege to use force in self-defense); *Commonwealth* v. *DeCaro*, 359 Mass. 388, 390 (1971).

The defendant claims that he reasonably believed that Nate and his friends might use deadly force against him. He points out that, one week earlier, he saw Nate, Bernie, and Shepard rob and beat up a "kid" who wanted to purchase marijuana; a few hours before the shooting, Bernie hit him over the head with a liquor bottle and slashed his tires; and he overheard Nate arrange to obtain a gun. These incidents do not provide sufficient evidence that "the defendant reasonably and actually

believed that he was in 'imminent danger of death or serious bodily harm.' " *Commonwealth* v. *Pike, supra* at 396.

In *Commonwealth* v. *Epsom*, 399 Mass. 254, 256 (1987), an incident inside a bar turned into an altercation where the victim and his friends were the aggressors. The victim charged the defendant and the defendant was ultimately struck by a bottle. *Id.* The defendant left the bar and the victim followed. *Id.* at 257. Outside the bar, the defendant pulled a gun and shot the victim repeatedly. *Id.* This court determined that the evidence was insufficient to raise the issue of self-defense because the "only evidence of an assault against the defendant related to events inside the pub [and] [t]here was no evidence that the defendant was assaulted or threatened outside the pub . . . ." *Id.* at 258. Similarly, in this case, the only assault, viewed in the light most favorable to the defendant, occurred a minimum of one and one-half hours before the shooting. The defendant offers no evidence that the members of the group assaulted or threatened him as they were leaving Bass's apartment for the second time. A self-defense instruction is not warranted on this evidence.

However, even assuming that the defendant reasonably believed that he was in imminent danger from the group, he would still not be entitled to a self-defense instruction, because there is no evidence that the defendant "availed himself of all proper means to avoid physical combat" by retreating or attempting to retreat. *Commonwealth* v. *Harrington, supra* at 450. See *Commonwealth* v. *Pike, supra* at 398-399. The defendant claims that he "had no opportunity to retreat since he was in a small alley next to the vehicle." We disagree. The location of the spent casings in front of Bass's apartment building and on the sidewalk near the driveway suggest that the defendant was near the sidewalk and thus had some avenues by which he could have retreated. This court has determined that generally, "self-defense . . . cannot be claimed by a [defendant] who provokes or initiates an assault." *Commonwealth* v. *Maguire*, 375 Mass. 768, 772 (1978). See *Commonwealth* v. *Naylor*, 407 Mass. 333, 335 (1990); *Commonwealth* v. *Pasteur*, 66 Mass. App. Ct. 812, 820 (2006). The defendant initiated the confrontation. The defendant testified that as Nate, Bernie, Langley,

Shepard, and Laster were leaving the apartment they were "coming towards [him]" and so he showed them his gun; they stopped and went to their car. Then the defendant went behind the dumpster. Instead of remaining safely behind the dumpster, the defendant "ran up" to the departing car and asked, "Where is Nate? I want to talk to Nate." He saw a "flash."[4] Then the defendant shot at the car four times, firing even as they tried to leave. Because the defendant's own evidence is that he initiated the altercation and created the circumstances by which he alleges he could not retreat, we conclude that the defendant was not entitled to a self-defense instruction.[5]

b. *Voluntary manslaughter.*[6] "Voluntary manslaughter is an unlawful killing 'arising not from malice, but from . . . sudden passion induced by reasonable provocation, sudden combat or excessive force in self-defense.' " *Commonwealth* v. *Acevedo,* 446 Mass. 435, 443 (2006), quoting *Commonwealth* v. *Carrion,* 407 Mass. 263, 267 (1990). The defendant claims that he was entitled to voluntary manslaughter instructions based on all three theories. We consider each in turn.

The defendant argues that when a "defendant reacted exces-

---

[4]The defendant testified that the "flash" could have been "a weapon of some type," perhaps something that could have been used to slash his tire. The defendant argues that "the jury should have been allowed to weigh whether the perceived weapon . . . reasonably created a threat warranting the exercise of self-defense." Even assuming that the weapon was a knife or a box cutter, the defendant would still have a duty to attempt at least to retreat unless there was no reasonable means of escape. In this case, there is nothing in his testimony to suggest that once he saw the flash he attempted to retreat. Furthermore, there is no evidence to suggest that there was no reasonable means of escape available.

[5]The facts in *Commonwealth* v. *Little*, 431 Mass. 782 (2000), on which the defendant relies, are easily distinguishable. In the *Little* case, the defendant and the victim argued and the defendant showed the victim his gun. *Id.* at 784. The defendant left and went to a friend's apartment. *Id.* As the defendant was leaving the apartment, the victim approached and kept advancing until the defendant warned the victim and pulled his gun. *Id.* at 784-785. The defendant testified that he "was scared" because the victim was "high" and he "made a motion like he was going for his hip." *Id.* at 785. Unlike the *Little* case where the victim was the aggressor, in this case, the defendant was the aggressor.

[6]At oral argument the Commonwealth withdrew its contention that the defendant did not preserve for appellate review his claim of entitlement to a jury instruction on voluntary manslaughter based on the theories of provocation and sudden combat.

sively to a perceived threat of deadly force . . . by firing too many shots in self defense, he [is] entitled to have the jury consider" a verdict of manslaughter. His claim has no merit, because an instruction on voluntary manslaughter under a theory of excessive force in self-defense is unavailable "if the Commonwealth proves that the defendant was not entitled to use deadly force." *Commonwealth* v. *Walker*, 443 Mass. 213, 218 (2005). See *Commonwealth* v. *Curtis*, 417 Mass. 619, 632 n.11 (1994). Because the defendant is not entitled to a self-defense instruction, for the reasons set forth above, an instruction on manslaughter by excessive force in self-defense is not available.

A voluntary manslaughter instruction based on reasonable provocation is warranted if "there is evidence of provocation deemed adequate in law to cause the accused to lose his self-control in the heat of passion, and if the killing followed the provocation before sufficient time had elapsed for the accused's temper to cool." *Commonwealth* v. *Andrade*, 422 Mass. 236, 237 (1996), quoting *Commonwealth* v. *Schnopps*, 383 Mass. 178, 180 (1981), *S.C.*, 390 Mass. 722 (1984). Reasonable provocation that would support an instruction on voluntary manslaughter is such provocation that "produce[s] in an ordinary person such a state of passion, anger, fear, or nervous excitement" that would eclipse the defendant's ability to reflect or exercise restraint. *Commonwealth* v. *Walden*, 380 Mass. 724, 728 (1980). "Provocation and 'cooling off' time must meet both a subjective and an objective standard." *Commonwealth* v. *Colon*, 449 Mass. 207, 220 (2007).

The defendant claims that his fear and excitement on the night of the incident is enough to support a voluntary manslaughter instruction based on reasonable provocation. He states that his fear and excitement were due to the "late hour, dark setting, knowledge that Nate might have a gun or weapon, [the defendant's] display of the gun to the group as they got in the car, and the group's . . . attacking him and slashing his tire a few hours before."[7] According to the defendant's own testimony, he had the tools needed to fix his flat tire right away but instead

---

[7]The facts in *Commonwealth* v. *Fortini*, 68 Mass. App. Ct. 701 (2007), on which the defendant relies, are easily distinguished. In that case, the defendant had been harassed earlier in the evening by strangers in a vehicle and so he

he purchased a gun, and then returned to his car and parked it in front of the dumpster near Bass's house instead of elsewhere, despite the fact that he noticed, as he was changing his tire, "that [Laster's] car was back in the alleyway." Viewed in the light most favorable to the defendant, a minimum of one and one-half hours passed between the assault and when he returned to change his tire. This evidence would not allow a jury to "infer that a reasonable person would have become sufficiently provoked." *Commonwealth* v. *McLeod,* 394 Mass. 727, 738, cert. denied sub nom. *Aiello* v. *Massachusetts,* 474 U.S. 919 (1985).

Moreover, there is no indication that Nate provoked the defendant at the time of the shooting. *Commonwealth* v. *Acevedo,* 446 Mass. 435, 444 (2006), quoting *Commonwealth* v. *Ruiz,* 442 Mass. 826, 838-839 (2004) ("It is well established that 'provocation must come from the victim' "). In addition, Bernie struck the defendant with a bottle at least one and one-half hours before the defendant shot the victim, allowing a cooling off period.[8] See *Commonwealth* v. *McLeod, supra* at 738-739 (fifteen to thirty minutes sufficient cooling off period and "significantly longer . . . than is usually the situation in manslaughter cases"); *Commonwealth* v. *Coleman,* 366 Mass. 705, 707 (1975) (no manslaughter instruction where defendant left scene after being punched, and then returned and shot victim several minutes later).

The defendant claims that the judge erred when he failed to provide manslaughter instructions on the basis of sudden combat. The defendant points to the "rolling down of the car window," the "flash," and the "sudden action in the car" as evidence to support a voluntary manslaughter instruction. Generally, for sudden combat to be the basis of a voluntary manslaughter instruction, the "victim . . . must attack the defendant or at

sat on his porch with a shotgun hoping to spot a registration number. *Id.* at 702-703. A stranger approached his porch, " 'lunged' at [him] and reached for the gun." *Id.* at 703. The defendant "took a step back" and shot him. *Id.* The court held that the defendant was entitled to reasonable provocation instructions. *Id.* at 706. Unlike the *Fortini* case, in this case, the defendant approached the victim.

[8]The defendant testified that at least four hours had passed between the time of the assault on him and the shooting.

least strike a blow against the defendant." *Commonwealth* v. *Pasteur*, 66 Mass. App. Ct. 812, 822 (2006). See *Commonwealth* v. *Brum*, 441 Mass. 199, 206 (2004); *Commonwealth* v. *Curtis*, 417 Mass. 619, 629 (1994). Here, neither the victim nor anyone in the group attacked or struck a blow against the defendant. In fact the group was in the car, leaving the scene. Furthermore, even if the victim initiates contact and there is "physical contact between a defendant and a victim[, it] is not always sufficient to warrant a manslaughter instruction." *Commonwealth* v. *Walden*, 380 Mass. 724, 727 (1980). See *Commonwealth* v. *Ruiz*, 442 Mass. 826, 839 (2004) (no sudden combat instructions where victim slapped and jumped on defendant because the "conduct presented no threat of serious harm to him"). No view of the evidence would support an instruction of manslaughter based on sudden combat.

2. *Motion for a new trial.* The defendant raised several ineffective assistance claims in his motion for a new trial that the judge denied without a hearing. Specifically, he asserted that counsel was ineffective because he failed to question the defendant on two matters; object to portions of the prosecutor's closing statement; cross-examine or impeach several witnesses; introduce expert evidence; and file a motion to suppress the defendant's statement to the police. We consider each in turn.

The decision to grant a motion for a new trial rests soundly within the judge's discretion and "will not be reversed unless it is manifestly unjust or . . . the trial was infected with prejudicial constitutional error." *Commonwealth* v. *Nieves*, 429 Mass. 763, 770 (1999). Moreover, we give "special deference to the decisions of a judge who was, as here, the trial judge." *Commonwealth* v. *Murphy*, 442 Mass. 485, 499 (2004). Because the denial of the motion for a new trial is being considered "in conjunction with [the] defendant's direct appeal from a conviction of murder in the first degree, we review it under the substantial likelihood of a miscarriage of justice standard required by G. L. c. 278, § 33E."[9] *Commonwealth* v. *Hill*, 432 Mass. 704, 710 n.14 (2000). See *Commonwealth* v. *Morgan*, 449 Mass. 343, 353 (2007).

---

[9] The defendant states, in his memorandum in support of the motion for a new trial, that "the deficiencies of counsel argued in this . . . motion deprived him of his right to counsel" under the Sixth Amendment to the United States

a. The defendant contends that trial counsel provided ineffective assistance of counsel by failing to question him about two matters that he claims would have demonstrated self-defense.[10] According to the defendant's affidavit, he telephoned Bass after the shooting to "get back [his] watch" and this tended to show "consciousness of innocence." Even assuming that this telephone call occurred, consciousness of innocence is of very little value, because there are a variety of different motives that can prompt action consistent with innocence. See *Commonwealth* v. *Evans*, 438 Mass. 142, 157 (2002), cert. denied, 538 U.S. 966 (2003). The defendant also argues that threats from the group "corroborate [the] defendant's claim that he acted in self-defense." At trial, counsel asked, "What happened after you heard the bottle shatter?" The defendant responded, "I ran away from him . . . yelling, 'You gonna jump me now?' " The defendant thus had an opportunity to testify about the alleged threats, but he failed to do so. In any event the defendant still would not be entitled to a self-defense instruction, because a minimum of one and one-half hours had passed between the assault and the shooting, which was a sufficient cooling off period. Furthermore, the defendant initiated the confrontation, and in these circumstances, as discussed above, the defendant is not entitled to a self-defense instruction. For these reasons the defendant's claim of ineffective assistance of counsel is unavailing. See *Commonwealth* v. *Thompson*, 431 Mass. 108, 120-121, cert. denied, 531 U.S. 864 (2000).

b. The defendant also contends that his trial counsel was ineffective because he failed to object to two portions of the

Constitution. The statutory standard of G. L. c. 278, § 33E, is more favorable than the constitutional standard for ineffective counsel claims; therefore, if the defendant does not prevail under the § 33E standard, he will not prevail under the constitutional standard. *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992).

[10]Although the defendant also argues that trial counsel provided ineffective assistance because he failed to question the defendant on "several points [that] tended to show self-defense or manslaughter," he does not explain how the failure to question the defendant would have shown manslaughter and under which of the three theories he is basing his claim. Pursuant to G. L. c. 278, § 33E, the defendant bears the burden of showing that counsel's errors were "likely to have unfairly influenced the jury's verdict." *Commonwealth* v. *Cormier*, 427 Mass. 446, 451 (1998), quoting *Commonwealth* v. *Plant*, 417 Mass. 704, 715 (1994). The defendant has failed to meet his burden.

prosecutor's closing argument. The defendant alleges that the prosecutor voiced a personal opinion when she stated, "If I saw a guy coming at me with a gun, I think there would be some movement in that car." The prosecutor made this statement as a rebuttal to the defendant's claim that because there was movement in the car he was justified in shooting at the car. Merely using a "first person pronoun does not interject personal belief into a statement." *Commonwealth* v. *Mamay*, 407 Mass. 412, 424 (1990). The prosecutor was merely arguing that the average person would move if they saw a gun such as the one wielded by the defendant. Therefore, we conclude that the prosecutor's conduct was not improper, and consequently trial "counsel's failure to object . . . becomes immaterial." *Commonwealth* v. *Wright*, 411 Mass. 678, 686 (1992).

In addition, the defendant argues that his counsel should have objected to the prosecutor's characterizing the defendant's story as "ridiculous." A prosecutor is allowed to characterize a defendant's story. See *Commonwealth* v. *Deloney*, 59 Mass. App. Ct. 47, 52 (2003) (acceptable for prosecutor to describe defendant's story as "preposterous"). A remark made during closing "must be considered in the context of the prosecutor's entire argument, as well as in light of the judge's instruction to the jury and the evidence at trial." *Commonwealth* v. *Bourgeois*, 391 Mass. 869, 885 (1984). Here, viewing the remark in the context of the prosecutor's entire argument and taking into consideration the fact that the judge reminded the jury at the beginning of trial and after the defense rested that closing arguments were not evidence, the prosecutor's characterization was proper. "Because there was no misconduct on the part of the prosecutor, there was no ineffective assistance of counsel for failure to object." *Commonwealth* v. *Kirwan*, 448 Mass. 304, 317 (2007).

c. The defendant next argues that trial counsel was ineffective for failing to impeach or cross-examine witnesses. First, the defendant argues that trial counsel should have impeached Shepard by cross-examining him about the "discrepancy between his trial and grand jury testimony" with respect to the timing of the shooting, impeached the medical examiner's testimony because of the "contradiction" between her testimony and the emergency room records, and impeached Laster's testimony regarding a

cellular telephone call he denied receiving during the argument at Bass's apartment. He claims that trial counsel's failure to probe these issues undercut the self-defense theory.[11] According to the defendant, if the shot that killed Nate came from the side of the car rather than the rear, it would support the claim that the defendant acted hastily in response to a threat rather than out of deliberate premeditation.

We need not detail the specifics of these arguments because even assuming that the claims had merit, the defendant would not be entitled to a self-defense instruction where he initiated the confrontation and failed to retreat or attempt to retreat. Furthermore, he presented no evidence that there was no reasonable means of escape available.[12] There was no ineffective assistance of counsel.

The defendant next claims that trial counsel failed to cross-examine Langley, the only other witness the defense called in this case, concerning inconsistencies in his claim that he heard the defendant threaten to get "heat" after Bernie assaulted him. The record shows that trial counsel tried to impeach Langley's trial testimony with the police report in which he recounted hearing the threat.[13] Even if we accept the defendant's contention, there is an obvious tactical reason trial counsel might not

---

[11]In the defendant's initial argument in the brief he contends that "[b]etter work by trial counsel would . . . have resulted in additional evidence supporting defendant's theory of self-defense or manslaughter." However, the defendant fails to state how impeachment and further cross-examination would support a manslaughter instruction. Moreover, he fails to state which of the three theories forms the basis for each claim of error.

[12]The defendant's brief is unclear how these ineffective assistance of counsel claims regarding impeachment and cross-examination of witnesses would have supported a manslaughter instruction. Moreover, because the defendant fails to provide affidavits or other evidence from the experts to support his assertion that the shot came from the side, it is mere speculation. "Unsupported speculation about possible expert evidence fails to sustain this burden." *Commonwealth* v. *Horton*, 434 Mass. 823, 834 (2001). It is the defendant's burden to demonstrate that trial counsel's errors were "likely to have unfairly influenced the jury's verdict." *Commonwealth* v. *Scott*, 430 Mass. 351, 356 (1999).

[13]Defense counsel asked Langley, "Did you hear [the defendant] saying . . . anything to them?" Langley replied, "I don't know what [the defendant] said." Trial counsel stated, "Didn't you very specifically tell the police in your statement, '[the defendant] was telling them they were all going to get it, [and] he would get the heat?' "

have wanted to impeach Langley: it would have reinforced Rolon's testimony that she overhead the defendant say something about getting "heat." See *Commonwealth* v. *Candelario*, 446 Mass. 847, 854 (2006) (deference given to tactical decisions of trial counsel unless decisions manifestly unreasonable).

The defendant further claims that trial counsel should have impeached Rolon because, according to the defendant, she told the grand jury that the defendant, while on the telephone inside her apartment, said he was going to "blast" his assailants but testified at trial that she heard him make the threat when he left the apartment. The judge found the "significance of this discrepancy elusive."[14] We agree, as it is the statement itself, not its timing in this particular context, that is relevant. Therefore, the failure to impeach on this matter did not constitute ineffective assistance of counsel.

d. The defendant asserts several grounds to support his next contention that trial counsel provided ineffective assistance by failing to file a motion to suppress his statement to the police. The defendant states that had the statement been suppressed, the defendant could have also sought to have the gun suppressed. Even if we assume that the gun was improperly admitted, it would not create a substantial likelihood of miscarriage of justice, because the Commonwealth had several witnesses who testified that the defendant was the shooter.

The defendant further argues that the police statement was obtained in violation of his Miranda rights. However, the prosecutor did not admit the police statement in evidence. She used it to impeach the defendant's testimony by showing that it did not contain any reference to the "movement" and "flash" within the car moments before the shooting.[15] Statements that are obtained in violation of the Miranda rights may be used to impeach a witness, so long as the statement was not involuntarily given. See *Commonwealth* v. *Harris*, 364 Mass. 236, 239-240 (1973).

The defendant next claims that the statement he gave to the

[14]Furthermore, the record indicates that Rolon testified before the grand jury that she heard the defendant issue the threat while he was using her telephone and while talking to himself as he left the apartment.

[15]After the Commonwealth's closing argument, the defendant attempted to get the police statement introduced as evidence for completeness but the judge refused.

police was involuntary because they pressured him by withholding medical treatment, telling him that others were giving statements and that he should "speak up to demonstrate his innocence." The only basis for this claim is the defendant's affidavit, which the judge did not credit. Because we give "special deference to the decision of the judge who was . . . the trial judge," we accept this finding. *Commonwealth* v. *Murphy*, 442 Mass. 485, 499 (2004). See *Commonwealth* v. *Schand*, 420 Mass. 783, 787 (1995) (in motion for new trial, judge is "final arbiter of matters of credibility"). See also *Commonwealth* v. *Sparks*, 433 Mass. 654, 661 (2001).

The defendant also contends that trial counsel should have sought to suppress his statement to the police because he was denied his right to use the telephone pursuant to G. L. c. 276, § 33A.[16] Unfavorable evidence gained through an intentional deprivation of a defendant's right to make a telephone call should be suppressed. *Commonwealth* v. *Jones*, 362 Mass. 497, 502-503 (1972). At trial, the defendant testified that the police officers gave him Miranda warnings and "gave [him] a couple phone calls." However, in his affidavit in support of his motion for a new trial the defendant claimed that he was not advised of his right to make a telephone call until over one hour after he had been arrested and that his request to make a telephone call was denied. Even assuming that the defendant was not told about his right to make a telephone call within one hour, he was informed before the inculpatory statement was given and consequently the statement would not have been suppressed.[17] See *Commonwealth* v. *Bouchard*, 347 Mass. 418, 420-421 (1964).

---

[16]General Laws c. 276, § 33A, states in relevant part: "The police official in charge of the station . . . shall permit the use of the telephone . . . for the purpose of allowing the arrested person to communicate with his family or friends, or to arrange for release on bail, or to engage the services of an attorney. Any such person shall be informed . . . upon his arrival . . . of his right to so use the telephone, and such use shall be permitted within one hour thereafter."

[17]The defendant claims that because the judge "did not specifically discredit [his] averment that he . . . asked to use the phone and said he did not want to talk with police," subsequent statements were involuntary. We disagree. The defendant fails to cite any authority for his underlying assertion that unless a judge specifically discredited a statement it is therefore credited. Here, the judge implicitly discredited these claims, which were based on the defendant's affidavit, by focusing on contradictory statements that were made during the

As there was no ineffective assistance of counsel, the judge did not err in denying the motion for a new trial.

3. *Review under G. L. c. 278, § 33E.* We have reviewed the entire record, including the defendant's arguments in his motion for a new trial, pursuant to our obligation under G. L. c. 278, § 33E, and discern no reason to exercise our power either to order a new trial or to reduce the murder verdict.

> *Judgments affirmed.*
>
> *Order denying motion for a new trial affirmed.*

---

defendant's trial testimony. For example, the motion judge stated that in the defendant's trial testimony he stated that the police "allowed him to make a couple phone calls" and that he described his experience with police as "cool. They gave me iced tea and I told them what happened." A motion judge can implicitly discredit self-serving statements. See *Commonwealth* v. *Murphy*, 442 Mass. 485, 507 (2004).